## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

GREGORY BROWN (26), MARQUES WALKER (27), CHRISTOPHER LEE WASHINGTON (31), ERNEST KETTER (32), ROBERT LESURE (33), CARLOS SERRANO (39), and RONNELL LOCKHART (40),

Defendants.

Case No. 23-CR-160 (NEB/JFD)

CONSOLIDATED ORDER ON REPORT AND RECOMMENDATIONS AND APPEAL OF ORDERS

---

Defendants have each been charged in the Third Superseding Indictment with various criminal counts arising from, or relating to, an alleged criminal racketeering enterprise—the "Highs"—which operates primarily on the north side of Minneapolis. (ECF No. 1708.) Trial is set to begin for Defendants at various points in 2025.[1] (ECF No. 1713.)

---

[1] Brown and Walker are scheduled for trial beginning on May 12, 2025. Washington, Ketter, Serrano, and Lockhart are scheduled for trial beginning on June 9, 2025. Lesure is scheduled for trial beginning on July 7, 2025. (ECF No. 1713 at 3–4.)

In advance of trial, Defendants filed various dispositive[2] and non-dispositive[3]

motions.[4] The government filed a consolidated pre-hearing response to the Defendants'

motions (ECF No. 1386) and a consolidated post-hearing response. (ECF No. 1581.) The

---

[2] The dispositive motions are docketed by Defendant as follows:
- Brown (ECF No. 1335.) Brown withdrew an additional suppression motion docketed at ECF No. 1333. (*See* ECF No. 1410.)
- Walker (ECF Nos. 1303, 1305, 1308, 1321.)
- Washington (ECF Nos. 1529, 1530, 1532.) Washington's remaining dispositive motion was denied as untimely. (ECF No. 1569 (denying ECF No. 1523).)
- Ketter (ECF No. 1325.)
- Lesure (ECF Nos. 1311, 1312, 1315.)
- Serrano (ECF No. 1329.)
- Lockhart (ECF Nos. 1292, 1294, 1322.)

[3] The non-dispositive motions are docketed as follows:
- Brown (ECF Nos. 1331, 1332, 1334.)
- Walker (ECF Nos. 1298, 1299, 1300, 1301, 1302, 1320.)
- Washington (ECF No. 1528.) Washington's remaining non-dispositive motions were denied as untimely. (ECF No. 1569 (denying ECF Nos. 1524, 1525, 1526, 1527, 1531, and 1533).)
- Ketter (ECF No. 1327.)
- Lesure (ECF Nos. 1313, 1314, 1316, 1317.)
- Serrano (ECF Nos. 1319, 1326, 1328, 1348.)
- Lockhart (ECF Nos. 1288, 1289, 1290, 1291, 1293, 1295, 1296, 1297, 1373, 1374.)

[4] The Court already addressed the motions brought by the other remaining Defendants named in the Third Superseding Indictment in the December 3, 2024 Consolidated Order on Report and Recommendation and Appeal of Orders (ECF No. 1583 ("December 3 Order")), the December 11, 2024 Order on Motions for Severance (ECF No. 1598 ("December 11 Order")), and the February 25, 2025 Order on Report and Recommendation. (ECF No. 1725 ("February 25 Order").) The Court also addressed the motions to sever parties (but not counts) and for recusal brought by these Defendants in the December 11 Order (ECF No. 1598 at 24–26) and in the December 17, 2024 Order on Motions for Recusal and Severance. (ECF No. 1608 ("December 17 Order").)

government did not file any response to Washington's motions. (ECF No. 1638 at 1 (noting that the government did not respond to Washington's motions).)

These motions were heard before Judge John F. Docherty, who issued the following:

*January 2 R&R (ECF No. 1616).* In the January 2 R&R, Judge Docherty addressed all the dispositive motions with the exception of one of Walker's motions and each of Washington's motions. He recommended denying or denying as moot each of the Defendant's motions, except for Lockhart's motion to suppress as to statements made on September 19, 2022, after Lockhart was handcuffed. (*See* January 2 R&R at 48[5] (granting, in part, ECF No. 1292[6]).)

*January 13 R&R (ECF No. 1638).* The January 13 R&R addressed all of Washington's dispositive motions, recommending denial of each motion.[7]

---

[5] Page numbers reflect CM/ECF pagination unless otherwise noted.

[6] The Court notes that the relief Lockhart requested in his motion docketed at ECF No. 1292 was partially duplicative of relief Lockhart requested as to the same statements in his motion docketed at ECF No. 1294. (*See* ECF No. 1581 at 26 n.7 (emphasizing that the government treated Lockhart's motion at ECF No. 1292 as "duplicative of his more fulsome motion at ECF No. 1294").) So, even though Judge Docherty's January 2 R&R recommended denying Lockhart's motion at ECF No. 1294, the January 2 R&R effectively also granted that motion as to statements made by Lockhart after he was handcuffed on September 19, 2022. (*See* January 2 R&R at 42–44.) The Court thus treats the January 2 R&R as granting Lockhart's motion at ECF No. 1294 to that extent.

[7] Washington was granted leave to file three belated pretrial motions, and so his dispositive motions were filed after the other Defendants. (ECF No. 1569 (granting, in part, the relief requested by Washington in his motion for leave to file pre-trial motions

*February 4 R&R (ECF No. 1697)*. This R&R addressed Walker's remaining suppression motion (ECF No. 1321), recommending that the motion be denied as moot.[8]

Brown, Walker, Ketter, Lesure, Serrano, and Lockhart each filed objections to the January 2 R&R, and Washington objected to the January 13 R&R.[9] No objections were filed to the February 4 R&R. The government filed responses to the objections, requesting that "the Court to adopt [each] R&R in its entirety."[10] (ECF No. 1692 at 4; ECF No. 1704 at 1.)

---

(ECF No. 1534)).) Judge Docherty thus analyzed Washington's dispositive motions separately from the other Defendants.

[8] Judge Docherty granted Walker's motion docketed at ECF No. 1321 to the extent that Walker requested a *Franks* hearing. (ECF No. 1610.) A *Franks* hearing was scheduled for January 14, 2025. (*Id.*; ECF No. 1639.) But prior to the *Franks* hearing, the government represented that "[t]he United States will not use materials from the warrant in question nor any derivative evidence" at trial. (ECF No. 1643 at 1.) The government further requested the Court deny Walker's motion at ECF No. 1321 as moot. (*Id.*) Judge Docherty subsequently recommended denying that motion as moot. (February 4 R&R at 3.)

[9] The respective objections are docketed as follows:
- Brown (ECF No. 1648.)
- Walker (ECF No. 1654.)
- Washington (ECF No. 1686.)
- Ketter (ECF No. 1655.)
- Lesure (ECF No. 1650.)
- Serrano (ECF No. 1653.)
- Lockhart (ECF No. 1645.)

[10] The Court thus considers the government to have waived any objection to the January 2 R&R's recommendation that statements made by Lockhart be suppressed from after he was handcuffed and before he was given *Miranda* warnings on September 19, 2022.

*December 27 Order (ECF No. 1612)*. In a separate order, Judge Docherty also addressed various non-dispositive motions brought by the Defendants. In that Order, Judge Docherty granted Lesure's motion for leave to file later motions (ECF No. 1317), and partially granted Brown's motion to adopt the motions of his co-defendants (ECF No. 1332), and Lockhart's motion for the government to retain notes of confidential reliable informants (ECF No. 1290). (December 27 Order at 14–15.) Judge Docherty also reserved for the trial court Lockhart's motion for counsel to participate in voir dire (ECF No. 1289) and kept under advisement Ketter's motion to adopt motions filed by his co-defendants (ECF No. 1327). (*Id*.) In all other respects, Judge Docherty denied or denied as moot each of the Defendants' non-dispositive motions. (*Id*.) Only Lesure appealed the December 27 Order. (ECF Nos. 1651.) Finally, the December 27 Order did not address the partially outstanding motions to sever counts (ECF Nos. 1293, 1313, 1328, 1373), which had been previously left under advisement in the Court's December 11 Order. (December 27 Order at 1 n.1.)

The Court has reviewed the January 2 R&R, the January 13 R&R, the February 4 R&R, and the December 27 Order de novo. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); D. Minn. L.R. 72.2(a)(3), (b)(3). In conducting this de novo review, the Court "may accept, reject, or modify, in whole, or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Based on the Court's de novo review, the Court accepts the January 2 R&R, the January 13 R&R, and the February 4 R&R, and affirms the December 27 Order to the extent consistent with the below analysis. Where the Court considers additional reasoning necessary, the Court provides supplemental analysis below.

## ANALYSIS

### I.    Dispositive Motions Requiring Supplemental Analysis

### A.    *Serrano's Motion to Suppress Evidence Seized from his Cell Phone and Snapchat Account (ECF No. 1329.)*

On October 6, 2023, United States Magistrate Judge David T. Schultz issued a warrant for the search of extracted data from a cell phone that was found in a vehicle operated by Serrano on the day of a warranted search of his residence on August 8, 2023. (Gov't Ex. E-1.[11]) The warrant was issued based on an affidavit from Drug Enforcement Administration ("DEA") Special Agent Demetra Camble. (*Id*. at 24.) Serrano challenges that search on the following grounds: (1) that the search was the fruit of an unlawful search of co-defendant Ja'darius Wright's cell phone; (2) that the search was supported by stale information; and (3) that Special Agent Camble's affidavit in support of the search did not establish probable cause to search the cell phone. (ECF No. 1329 at 2–4; ECF No. 1552.) In the January 2 R&R, Judge Docherty found each of these arguments to

---

[11] All Government Exhibits, except for those for Christopher Washington, were produced conventionally with the Court at the pretrial motions hearing. (ECF No. 1431.) Pagination for these exhibits reflects the PDF pagination of the exhibits.

be unpersuasive. (January 2 R&R at 31–36.) The Court agrees, and supplements Judge Docherty's reasoning below.

*Fruit of the Poisonous Tree*. First, as to Serrano's argument that the search of his cell phone was derived from an unlawful search of stored data on co-defendant Ja'darius Wright's iPhone 11,[12] (ECF No. 1552 at 4 n.1), the Court need not consider Serrano's argument that he has standing to challenge the validity of the search.[13] The Court denied

---

[12] Two cell phones, an iPhone 11 and an iPhone 13, were seized from Defendant Ja'darius Wright's person at Minneapolis-St. Paul International Airport on May 12, 2022. (February 25 Order at 5–6 (describing facts of the seizure from Wright).) The search of that phone eventually yielded evidence of the "mrwrightguy" Snapchat account data, from which investigators learned of the "NOGOODLOS" Snapchat account. (Gov't Ex. E-1 ¶¶ 34–38.) A warrant for the search of the "NOGOODLOS" Snapchat account was issued on March 10, 2023, by United States Magistrate Judge Dulce J. Foster. (*Id*. ¶ 39.) As a result of that search, investigators learned that the "NOGOODLOS" Snapchat account was utilized by Serrano. (*Id*. ¶ 40.) Based on this evidence, investigators were able to obtain a warrant to search Serrano's Avondale, Arizona residence on August 2, 2023. (*Id*.) Several cell phones belonging to Serrano, including the cell phone in dispute, were found during the August 2, 2023 search of Serrano's residence. (*Id*.) On August 8, 2023, a state search warrant was issued to search three seized phones. (*Id*. ¶ 41.) Data from the cell phone in dispute was then extracted and subsequently provided to the DEA. (*Id*. ¶¶ 41–42.) The October 6, 2023 warrant authorized the search of that extracted data. (*Id*. Attach. A.)

[13] Serrano argues that because 18 U.S.C. Section 2518(10)(a) provides that "[a]ny aggrieved person . . . may move to suppress the contents of any wire or oral communication intercepted," he has standing to challenge the search of the stored communications between him and Wright that were obtained from Wright's phone. (ECF No. 1653 at 3.) In response, the government argues that this statute only applies to "intercepted" communications—that is, communications "acquired during transmission, not while [they are] in electronic storage." (ECF No. 1692 at 2 (citing *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002)). The Eighth Circuit has not yet addressed whether a criminal defendant has standing to challenge the search of communications involving them that are found during the search of a device of a different individual. *See Thornton v. Thornton*, 492 F. Supp. 3d 810, 815 (W.D. Ark. 2020) (following *Konop*, but

Wright's motion to suppress evidence obtained from the iPhone 11 in its February 25 Order. (February 25 Order at 29.) So, even assuming Serrano has standing to challenge the search of Wright's iPhone 11, his argument is moot—the Court has already ruled that evidence from Wright's iPhone 11 is not subject to exclusion. (*Id*.)

*Staleness*. Second, the Court agrees with Judge Docherty's reasoning that Serrano's Snapchat communications with Ja'darius Wright (spanning fourteen months from February 2021 to May 2022) were not rendered stale by the time that the cell phone was seized on August 2, 2023.[14] (January 2 R&R at 33–35.) The fourteen months of ongoing communications between Serrano and Wright were not, as Serrano asserts, a "paucity of contacts." (ECF No. 1653 at 4.) Rather, they were indicative of a continuous (albeit irregular) pattern of communications regarding drug-trafficking activity between the co-conspirators.[15] (Gov't Ex. E-1 ¶¶ 34–38.) The record supports the inference that the

_____

noting that "the 8th Circuit has not addressed this issue" of whether interception must occur during transmission); *Leitner v. Morsovillo*, No. 21-CV-3075-SRB, 2022 WL 7074322, at *6–7 (W.D. Mo. Oct. 12, 2022) (same). Because the Court need not resolve this question to dispose of Serrano's motion, the Court declines to do so, given the absence of controlling Circuit precedent.

[14] From August 2, 2023 to October 6, 2023, the seized cell phone data was in continuous law enforcement custody. (Gov't Ex. E-1 ¶¶ 40–42.) The affidavit sets forth that the cell phone "was stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the device first came into the possession of law enforcement until the time it was forensically extracted." (*Id*. ¶ 45.)

[15] In conducting its de novo review, the Court heeded Serrano's request for "the court to examine closely" the communications between Serrano and Wright. (ECF No. 1653 at 4.)

Snapchat communications regarding drug-trafficking activity between Wright and Serrano would have continued unabated after May 12, 2022, were it not for the fact that Wright's iPhone 11 was seized on that date. (*Id*. ¶ 32.) And this supposition is buttressed by the abundance of evidence uncovered during the search of Serrano's Avondale, Arizona residence. (*Id*. ¶ 40 (listing that 7.7 kilograms of cocaine, $240,000.00 in United States currency, thirteen firearms, and several cell phones were seized from the search).)

*Probable Cause*. Finally, even if the Court accepts Serrano's argument that the Snapchat information was stale and disregards all conclusory statements made in the affidavit,[16] the affidavit provided more than a sufficient basis for Judge Schultz to have determined that probable cause existed for the search. The fact that 7.7 kilograms of cocaine, $240,000.00 in United States currency, 13 firearms, and several cell phones were seized from Serrano's residence, by itself, provided probable cause that evidence of drug-trafficking activity would be found in the phone seized from Serrano's residence.[17]

---

A close review of these communications shows that the two individuals were engaged in a pattern of ongoing communication about drug-trafficking. (Gov't Ex. E-1 ¶¶ 34–38.)

[16] Serrano objects that certain paragraphs of the affidavit were conclusory, including the assertion in Paragraph 52 that Special Agent Camble knew that Serrano supplied Calvin Wright with narcotics. (ECF No. 1653 at 6.) But as Judge Docherty noted, "over-inclusion of information does not detract from probable cause." (January 2 R&R at 36.) Thus, the Court analyzes probable cause, while ignoring conclusory statements in the affidavit.

[17] Serrano does not challenge the August 2, 2023 warrant issued to search his residence.

Moreover, even if the affidavit was deficient in establishing probable cause, the exclusion of evidence from the search of the cell phone would not be a warranted remedy under the good-faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 919–20 (1984). In executing the search of the extracted data from Serrano's cell phone, investigators acted in reasonable reliance on the warrant signed by the neutral and detached Judge Schultz, which was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[18] *United States v. Ortiz-Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (citation omitted). Thus, Serrano's motion to suppress evidence obtained from the search of the cell phone is denied.

B.    *Lockhart's Motion to Suppress Searches, Seizures, and Statements on September 19, 2022 (ECF No. 1294.)*

Lockhart moves to exclude evidence obtained from his person and from a bag in his possession while he was stopped on September 19, 2022, at Minneapolis-St. Paul International Airport ("MSP Airport"). (ECF No. 1294 at 1, 4–9.) Lockhart also moves to suppress various statements that he made to officers while he was stopped before he was

---

[18] None of the other exceptions to the *Leon* good-faith rule apply either. First, the affidavit in support of the warrant did not include a false statement or omission made intentionally or with reckless disregard for the truth to mislead Judge Schultz that there was probable cause to search the phone. Second, Judge Schultz did not wholly abandon the judicial role in issuing the warrant. And third, the warrant was not so facially deficient that no police officer could reasonably presume it to be valid. *See Ortiz-Cervantes*, 868 F.3d at 702–03.

handcuffed by law enforcement.[19] (*Id*. at 1–2, 9–11.) In the January 2 R&R, Judge Docherty denied Lockhart's motion to suppress the evidence seized from him and the pre-handcuffing statements made by him. (January 2 R&R at 37–44.) The Court agrees, and supplements Judge Docherty's reasoning below.

Lockhart traveled to MSP Airport on a Sun Country Airlines flight departing from Phoenix, Arizona—which is considered to be a source city for narcotics entering Minnesota. (ECF No. 1664 (restricted) at 27:18–28:2; ECF No. 1426-2 at 2.) Lockhart had purchased his plane ticket earlier that same day. (ECF No. 1426-2 at 2.) On his flight itinerary, Lockhart listed that he was traveling with a child. (ECF No. 1664 at 32:17–25.) L.P.—Lockhart's unindicted co-conspirator—was also on the same flight and had listed the same child in her itinerary. (*Id*.; ECF No. 1426-2 at 2.) L.P. was identified by MSP Airport Police Sergeant Jeffrey Trevino as a suspected fentanyl courier. (ECF No. 1664 at 28:3–10; *see also* ECF No. 1426-2 at 2.)

MSP Airport Police arranged to have two K-9 officer teams await the arrival of the Sun Country Airlines flight arriving from Phoenix. (ECF No. 1664 at 31:4–19.) Ramsey

---

[19] In the January 2 R&R, Judge Docherty recommended the suppression of statements Lockhart made to officers after he was handcuffed. (January 2 R&R at 44.) The government made no objections to this recommendation. (ECF No. 1692 at 4 ("The United States asks the Court to adopt the R&R in its entirety.").) And the Court considers this to be consistent with Eighth Circuit precedent. *See United States v. Martinez*, 462 F.3d 903, 910 (8th Cir. 2006) ("[W]e follow the Supreme Court's cue and find that [the seized defendant] was entitled to *Miranda* warnings at the time he was handcuffed." (applying the reasoning of *Berkemer v. McCarty*, 468 U.S. 420 (1984))).

County Detective Mark Altendorfer and his K-9 Officer, Molly, were positioned at the bottom of the jet bridge (*Id*. at 33:11–15), while MSP Airport Detective Mitch Irvin and his K-9 Officer, Zippo, were located in the gate area of the terminal. (*Id*. at 33:16–19.) At the time, Molly was certified in detecting the scents[20] of various narcotics (including heroin, cocaine, methamphetamine, marijuana, and MDMA), but she was not certified in detecting fentanyl. (Gov't Exs. F-1, F-2; ECF No. 1664 at 34:16–19, 79:4–24.) Similarly, Zippo was certified in detecting the scents of heroin, cocaine, methamphetamine, and marijuana, but not fentanyl. (Gov't Exs. F-3, F-4; ECF No. 1664 at 35:18–22, 106:2–18.) But both Molly and Zippo had received training on detecting fentanyl, and had each actually detected fentanyl in the field. (ECF No. 1664 at 79:25–80:11, 107:16–108:2.)

Upon arrival, L.P. deplaned first, followed by Lockhart—who had retrieved a car seat—and they each passed Molly at the bottom of the jet bridge.[21] (*Id*. at 36:12–37:3, 39:3– 20.) As L.P. walked by carrying a small gray bag, "Molly had a distinct change in behavior," but she did not definitively alert to the odor of narcotics. (*Id*. at 86:13–22; *see also id*. 37:8–11; 61:11–62:13, 92:7–9, 96:13–20.) Then, as Lockhart went past, Molly positively alerted to the odor of narcotics. (*Id*. at 39:11–20, 40:10–14.) After Lockhart and

---

[20] Because Molly is trained to detect the scent of narcotics, she can smell lingering odors (or "scent cones") from narcotics that were recently present in an area, even if the narcotics are no longer present in the area. (ECF No. 1664 at 37:8–38:19.)

[21] Molly was conducting dog sniffs of all passengers as they passed by. (ECF No. 1664 at 36:8–11, 85:24–86:2.)

L.P. passed Molly, they spoke and looked back concernedly at Sergeant Trevino[22] as they ascended the jet bridge.[23] (*Id*. at 44:5–18.) When they approached the end of the jet bridge, L.P. surreptitiously passed a small gray bag to Lockhart, who then placed it under his armpit and hid it beneath a blanket. (Gov't Ex. F-5 at 07:16–07:18; *see also* ECF No. 1426-2 at 2.) Upon entering the terminal, Lockhart and L.P. split, with a young child joining Lockhart, and an infant accompanying L.P. (Gov't Ex. F-5 at 07:21–23; Gov't Ex. F-6 at 00:05–00:10.) When Sergeant Trevino was asked at the evidentiary hearing if "the fact that the pair went in separate directions raise[d] any suspicions for you," he replied "[t]hat's not something I would normally see of people traveling together." (ECF No. 1664 at 45:14–21.)

As Lockhart proceeded into the gate area, Zippo positively alerted to the odor of narcotics on Lockhart. (Gov't Ex. F-6 at 00:09–00:19; ECF No. 1664 at 48:16–49:5, 113:3–9.) Zippo also positively alerted to L.P.'s bags, which she had set down on chairs in the gate area. (Gov't Ex. F-6 at 00:28–00:31; ECF No. 1664 at 49:11–15.) Lockhart and the young

---

[22] The January 2 R&R incorrectly states that Sergeant Trevino was "positioned in the gate area" along with Detective Irvin and Zippo. (January 2 R&R 37.) But Sergeant Trevino was positioned at the bottom of the jet bridge, and he followed Lockhart and L.P. up the jet bridge from behind. (ECF No. 1664 at 33:12–15, 35:25–36:1; Gov't Ex. F-5 at 07:22–07:27 (showing Sergeant Trevino emerge from the jet bridge after Lockhart and L.P.).) The Court considers that the January 2 R&R meant to refer to DEA Officer Burton Crary who was positioned at the top of the jet bridge in the gate area. (ECF No. 1664 at 41:9–13.)

[23] Up until Lockhart reached the end of the jet bridge, none of the conduct described was captured on video footage that is in the record.

child proceeded to walk away from the gate area, leaving behind L.P. with the infant. (Gov't Ex. F-6 at 00:26–00:31.)

At that point, DEA Officer Burton Crary approached Lockhart and notified him about the K-9 Officer alert. (ECF No. 1664 at 51:8–15; Gov't Ex. F-8 at 00:32.) Sergeant Trevino then joined as well. (ECF No. 1664 at 49:22–24, 51:8–11.) Officer Crary and Sergeant Trevino were each in plain clothing and had their firearms concealed beneath their shirts. (*Id*. at 49:25–50:6.)

Sergeant Trevino's body-worn camera footage captured the interaction between Lockhart and the law enforcement officials. (Gov't Ex. F-7.) The Court recounts below the complete interaction from the moment Officer Crary first approached Lockhart, until the moment Sergeant Trevino placed Lockhart under arrest:

> **Officer Crary:** [*Approaches Lockhart and speaks inaudibly*] . . . Drug Enforcement Administration . . . [*Sergeant Trevino arrives*] . . . The dog just alerted . . . on the bag here. Is there anything in there?
> **Lockhart:** [Indiscernible]
> **Sergeant Trevino:** He, he's just asking questions . . . . You're not in a rush, you're not in any trouble. Did you pack your own bags?
> **Lockhart:** Huh?
> **Sergeant Trevino:** Did you pack your own bags?
> **Lockhart:** [*Shakes head side-to-side*] No.
> **Sergeant Trevino:** Does this bag [*pointing at small gray bag in Lockhart's arms*] belong to you?
> **Lockhart:** [*Looks down at small gray bag*] Huh?
> **Sergeant Trevino and Officer Crary, Overlapping:** Does this bag [*each pointing at small gray bag*] belong to you?
> **Lockhart:** I picked it up.
> **Sergeant Trevino:** From where?
> **Lockhart:** Huh?
> **Sergeant Trevino:** Where did you just pick it up from?

14

**Lockhart:** [*Points back at Sun Country Airlines gate*]

**Sergeant Trevino:** Where's that?

**Lockhart:** [Indiscernible] . . . From the airplane.

**Sergeant Trevino:** That's not your bag? You took someone else's bag?

**Lockhart:** Picked it up. [*Points at the young child*] He picked it up. I thought it was [*points again at the young child*] his bag.

**Sergeant Trevino:** Do you mind if I take a look at it?

**Lockhart:** Sure. [*Lockhart passes bag to Sergeant Trevino*]

**Sergeant Trevino:** This isn't your bag though?

**Lockhart:** No. [*Points again at young child*] Just picked it up from him.

**Sergeant Trevino:** Whose bag is this?

**Lockhart:** [*Points again at young child*] He just picked it.

**Officer Crary:** [*Speaking to young child*] Hey son, is this . . .

**Sergeant Trevino:** [*Speaking to Lockhart*] But I just . . . . She just handed this to you on the jet bridge when you were walking up . . .

**Lockhart:** Who?

**Trevino:** That, that woman you were travelling with. The one that you were talking to.

[Indiscernible]

**Lockhart:** I, I talked to her, yeah. She asked me to hold her purse.

**Sergeant Trevino:** You don't know her? . . . Oh, so you're not associated with her at all? Because I saw you with the car seat . . . [Indiscernible] . . . I thought you guys knew each other.

**Officer Crary:** And then you said something down over here . . . [*pointing at the gate area*]

[Indiscernible]

**Lockhart:** I never said nothing there.

**Sergeant Trevino:** What's that?

**Lockhart:** I never said nothing there.

**Officer Crary:** So, do you have a boarding pass with you?

**Lockhart:** [*Speaking to young child*] [Indiscernible], you got the boarding pass?

**Sergeant Trevino:** [*Grabbing backpack from Lockhart's back while holding handcuffs*] I need you to take this off real quick . . . . You're . . . [indiscernible] . . . you're under arrest. You're being detained. Okay? [*Places handcuffs around Lockhart's wrists behind his back*].

(*Id*. at 00:25–01:45.)

At some point during this interaction—after the small gray bag had been seized from Lockhart, but before Lockhart had been placed under arrest—Sergeant Trevino "squeezed" the bag and "felt – what [he] believed . . . were the vacuum-sealed packages of the pills." (ECF No. 1664 at 52:7–10, 54:6–10; *see* Gov't Ex. F-7 at 01:03–01:06.) After that, but still before Lockhart was arrested, Sergeant Trevino dropped the bag on the ground, and Zippo sniffed the parcel, again alerting for the presence of narcotics. (ECF No. 1664 at 55:1–56:1, 114:7–14; Gov't Ex. F-7 at 01:29–01:31; Gov't Ex. F-8 at 01:43–01:47.)

In addition to the small gray bag, MSP Airport police also seized a cell phone from Lockhart incident to his arrest. (ECF No. 1426-2 at 2; *see also* ECF No. 1543 at 4 (conceding that the seizure was "pursuant to [Lockhart's] arrest").) On October 7, 2022, Minneapolis Police Sergeant Walter Alvarado sought a warrant to search the phone seized from Lockhart. (ECF No. 1426-2 at 4.) On October 10, 2022, Hennepin County, Minnesota District Court Judge Patrick Robben issued the search warrant for the phone. (*Id*. at 6.)

***Seizure of Lockhart's Person***. Assuming that Lockhart was subject to an investigatory stop when Officer Crary and Sergeant Trevino approached him,[24] the Court must ascertain whether there was reasonable suspicion to seize him. *United States v.*

---

[24] Sergeant Trevino described this interaction as a "consensual contact." (ECF No. 1664 at 49:23.) The Court assumes that the encounter constituted an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 21 (1968). *See United States v. Wallraff*, 705 F.2d 980, 985, 989 & n.3 (8th Cir. 1983) (applying the *Terry* reasonable-suspicion analysis where officers with concealed firearms approached a suspected drug courier at MSP Airport and "asked the defendant if he would mind talking with them for a moment").

*McMillion*, 101 F.4th 573, 576 (8th Cir. 2024) ("A police officer may conduct an investigative stop . . . if he a reasonable suspicion supported by articulable facts that criminal activity may be afoot." (cleaned up and citations omitted)). To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id*. (citation omitted). In other words, the level of suspicion "must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause." *Id*. (citation omitted).

The Court has no difficulty concluding that even if officers did not have probable cause to arrest Lockhart when they first approached him, they definitely had at least reasonable suspicion for an investigatory stop. First, officers knew that Lockhart was arriving from Phoenix—a source city for trafficked narcotics into Minnesota. (ECF No. 1664 at 27:18–28:2; ECF No. 1426-2 at 2.) Second, officers knew that Lockhart purchased his plane ticket that same day and shared a flight itinerary with L.P., who was suspected of fentanyl couriering. (ECF No. 1426-2 at 2.) Third, two different certified[25] K-

---

[25] It is irrelevant for the reasonable-suspicion analysis that the dogs were not certified at the time to detect fentanyl, even though Lockhart and L.P. only had fentanyl in their possession. In analyzing reasonable suspicion, courts focus on what officers reasonably knew at the time of the intrusion. *See United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) ("The determination of whether . . . reasonable suspicion existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." (cleaned up and citation omitted)). Here, officers knew at the time that two different K-9 officers, who were each trained and certified to detect various narcotics (and trained to detect fentanyl), positively alerted to Lockhart.

9 officers alerted to Lockhart for the scent of narcotics.[26] (ECF No. 1664 at 39:11–20, 40:10–14, 48:16–49:5, 113:3–7.) And fourth, officers witnessed Lockhart engage in various suspicious activities, including: (1) looking concernedly back down the jet bridge at officers; (2) attempting to conceal a small gray bag given by L.P. beneath a blanket; and (3) splitting apart from L.P. and the infant with the young child immediately after entering the gate area. (*Id*. at 44:5–18; Gov't Ex. F-5 at 07:16–07:22; Gov't Ex. I-6 at 00:05–00:10.)

*Pre-Handcuffing Statements*. The next question for the Court to consider is whether Officer Crary and Sergeant Trevino elicited involuntary inculpatory statements from Lockhart, in violation of *Miranda v. Arizona*.[27] As an initial matter, simply because Lockhart was subject to an investigatory stop does not mean that *Miranda* warnings were required. *See Martinez*, 462 F.3d at 909 ("Most *Terry* stops do not trigger the detainee's *Miranda* rights." (cleaned up and citation omitted)). Rather, courts are to "look[] not to the fact that the detention was a *Terry* stop, but rather to the circumstances bearing on the question of custody." *Id*. Put differently, courts consider under the totality of the

---

[26] From the Court's de novo review of the record and the testimony provided at the evidentiary hearing, the Court agrees with Judge Docherty that there is no evidence that either Molly or Zippo were cued by handlers to alert on Lockhart. (January 2 R&R at 42.)

[27] In *Miranda v. Arizona*, the Supreme Court held that law enforcement must provide a criminal suspect with certain warnings before subjecting them to custodial interrogation. 384 U.S. 436, 467–72 (1966). The parties do not seriously dispute that Lockhart was interrogated. Thus, the inquiry turns on whether the interrogation was custodial.

circumstances whether "[a] reasonable person would . . . feel he was at liberty to stop the questioning and leave." *Id*. (determining that the defendant's "freedom was restricted to a degree often associated with formal arrest . . . at the time he was handcuffed").

The Court reviewed the video footage of Lockhart's seizure de novo, and agrees with Judge Docherty that Lockhart was not subject to a custodial interrogation until the moment that he was placed in handcuffs. (January 2 R&R at 44.) It is true that some facts weigh in favor of the interrogation being custodial, such as officers "initiat[ing] contact" with Lockhart and "plac[ing him] under arrest at the termination of the questioning." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (describing various indicia of custody). But these indica are outweighed by the facts that Lockhart was "informed at the time of questioning" that he was not in any trouble; that he "possessed unrestrained freedom of movement during questioning;" that officers did not employ "strong arm tactics or deceptive stratagems;" and that the atmosphere of questioning in the airport terminal by non-uniformed officers with concealed firearms was not "police dominated."[28] *Id*.

---

[28] A salient illustration of the non-custodial nature of the pre-handcuffing atmosphere was that for the duration of the stop, the young child with Lockhart was coughing, running around, and jumping on the airport chairs like any kid might do in an informal, casual environment after a long airplane ride. (*See* Gov't Ex. F-7.)

Thus, statements made by Lockhart prior to being handcuffed need not be suppressed under *Miranda*, and the Court may consider these statements in analyzing the reasonableness of the search of the small gray bag obtained from Lockhart's person.

**Search of Small Gray Bag**. When the officials repeatedly asked Lockhart during the stop if the bag was his, Lockhart consistently disclaimed any ownership of the parcel. (Gov't Ex. F-7.) First, Lockhart claimed that he just picked it up from the airplane. (*Id*. at 00:50–00:54.) Then, Lockhart said the young child with him picked it up, and that Lockhart thought it was his. (*Id*. at 00:56–00:59.) Officers also knew that both of these statements were false, because they had seen L.P. pass the bag to Lockhart at the end of the jet bridge. (Gov't Ex. F-5 at 07:16–07:18; *see also* ECF No. 1426-2 at 2.) When confronted by this fact, Lockhart claimed that L.P. just asked him to hold her purse. (Gov't Ex. F-7 at 1:06–01:15.) And when Sergeant Trevino directly asked Lockhart, "[d]o you mind if I take a look at [the bag]," Lockhart said, "sure," and provided it to Sergeant Trevino. (*Id*. at 00:59–01:02.)

The Court concludes that even assuming Lockhart had a reasonable expectation of privacy in the contents of the small gray bag prior to the stop, he abandoned that interest by consenting to Sergeant Trevino's search of the bag. Thus, Lockhart has no standing under the Fourth Amendment to challenge the warrantless search. *See United States v. Garcia-Garcia*, 957 F.3d 887, 892 (8th Cir. 2020) ("[A] warrantless search is valid if

conducted pursuant to the knowing and voluntary consent of the person subject to a search." (quotation marks and citation omitted)).

Courts evaluate whether there was consent based not "on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented." *Id*. (citation omitted). "Consent . . . may be inferred from the [defendant's] words, gestures, and other conduct." *Id*. at 895 (citation and quotation marks omitted). In considering the voluntariness of a defendant's consent, courts evaluate various factors, including the defendant's:

> age, education, intelligence, sobriety, and experience with the law; and . . . context . . . , such as the length of . . . questioning, the substance of any discussion . . . preceding the consent, whether the defendant was free to leave . . . , and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*Id*. at 896–97 (citing *United States v. Correa*, 641 F.3d 961, 966–67 (8th Cir. 2011)). Law enforcement is "not required to demonstrate that [the defendant] knew of his right to refuse the request to search as a prerequisite to establishing . . . voluntary consent." *Id*. at 897 (citation omitted). Rather, the government need only establish that "a reasonable officer would believe that the consent was not the result of duress or coercion, express or implied." *Id*. (quotation marks and citation omitted).

From the Court's review of the video evidence, Lockhart unequivocally consented to the search of the bag when he voluntarily provided the bag to Sergeant Trevino and audibly said "sure" in response to Sergeant Trevino's inquiry about taking a look at the

bag. (Gov't Ex. F-7 at 00:59–01:02.) Moreover, the Court finds that Lockhart reasonably presented to the officers as an adult of sound-mind and ordinary intelligence, who was fully aware of the nature of their questions. (*Id*. at 00:25–01:02.) In addition, officers made clear at the outset of the conversation that Lockhart was not in any trouble and had only been questioning him for a mere thirty-seven seconds before he consented to the search. (*Id*.) Finally, Lockhart made no contemporaneous objection as Sergeant Trevino squeezed the bag to feel for narcotics or as Sergeant Trevino dropped the bag for Zippo to conduct an open-air sniff. (*Id*. at 01:03–01:06, 01:29–01:31.) Under these circumstances, a reasonable officer would believe Lockhart voluntarily consented to the search of the bag and did not limit the scope of that consent. Thus, Lockhart does not have standing to challenge the search of the small gray bag, pursuant to the consent exception.

But even if the scope of Lockhart's consent could be construed as limited, the Court agrees with Judge Docherty that the abandonment exception to the warrant requirement also negates Lockhart's Fourth Amendment standing. (January 2 R&R at 39–41.) Under the abandonment exception, "[w]hen a person voluntarily abandons his interest in property, . . . he relinquishes any expectation of privacy and may not challenge a search of that property based on the Fourth Amendment." *United States v. Cambreros-Villapuda*, 832 F.3d 948, 951–52 (8th Cir. 2016).

In *United States v. Washington*, the Eighth Circuit applied the abandonment exception when law enforcement officials repeatedly asked the defendant if he was the

owner of a bag found on a Greyhound bus, and the defendant consistently denied any ownership in the bag. 197 F.3d 1214, 1216 (8th Cir. 1999) ("Since [defendant] has consistently disavowed any ownership interest in the bag containing the cocaine, he is precluded from claiming that the bag was searched and its contents seized in violation of his constitutional rights."). As in *Washington*, Lockhart denied ownership of the small gray bag on multiple occasions during his short conversation with Officer Crary and Sergeant Trevino. (*See* Gov't Ex. F-7 at 00:50–01:15.) And Lockhart never requested the bag's return after he gave it to Sergeant Trevino. (*Id.* at 01:02–01:45.) Viewed objectively, the totality of the circumstances establish that Lockhart abandoned any expectation of privacy he maintained in the small gray bag.

***Search of Lockhart's Phone****.* Finally, the Court must determine whether the search of the phone seized from Lockhart pursuant to his arrest was constitutional.[29] Lockhart concedes that the seizure of the cell phone was incident to his arrest. (ECF No. 1543 at 4.) So, the permissibility of the cell phone's seizure turns on whether there was probable cause to arrest Lockhart. *Riley v. California*, 573 U.S. 373, 388 (2014) (recognizing that the

---

[29] Judge Docherty never specifically addressed whether the search of the cell phone seized from Lockhart was reasonable, but Lockhart's motion expressly contemplated suppressing "*All* Evidence . . . Gathered and Derived" from his detention at MSP Airport. (ECF No. 1294 at 4 (emphasis added).) In support of his motion, Lockhart presented the October 10, 2022 warrant regarding the search of the cell phone seized. (ECF No. 1426-2.) The Court thus also addresses whether the search of that cell phone was constitutional.

"officers could have seized and secured [the defendants'] cell phones [incident to their lawful arrest] to prevent destruction of evidence while seeking a warrant").

The officers had probable cause to arrest Lockhart and seize items from his person incident to arrest. On top of all the reasons discussed above as to reasonable suspicion for Lockhart's initial seizure, the investigatory stop revealed that: (1) Lockhart repeatedly lied about the nature of how the small gray bag came into his possession; (2) Sergeant Trevino could plainly feel the presence of what he believed to be vacuum-sealed narcotics in his training and experience; and (3) Zippo again alerted to the odor of narcotics on the bag when he had the chance to sniff it while it was stationary on the ground. (*See* Gov't Ex. F-7; ECF No. 1664 at 54:6–10, 55:1–56:1, 114:7–14.)

Officers then searched that phone pursuant to a valid warrant issued by Judge Robben on October 10, 2022. (ECF No. 1426-2.) The affidavit in support of the warrant laid out the facts discussed above to establish probable cause that Lockhart was engaged in criminal drug-trafficking activity. (*Id*. at 2.) The affidavit also described why the affiant believed that evidence of such drug-trafficking activity would be found on the seized cell phone. (*Id*. at 2–3.) The Court concludes there was probable cause on the face of the warrant for the search of the cell phone. But even if the warrant was deficient, the exclusionary rule does not apply to evidence obtained from the cell phone, because officers relied in good faith on a search warrant issued by neutral and detached judicial officer, and none of the exceptions to the *Leon* good-faith rule apply. *See* 468 U.S. at 920.

24

C.      *Washington's Motion to Suppress Evidence Obtained from Tracking Device on 2014 Lincoln MKZ (ECF No. 1530.)*

On July 18, 2023, Hennepin County, Minnesota, District Court Judge Michael Burns issued a warrant authorizing the placement of a tracker device onto Washington's Lincoln MKZ vehicle. (Washington Ex. 00172353 at 8.[30]) Washington challenged this warrant, arguing that there was insufficient probable cause in the affidavit to support the issuance of the warrant. (ECF No. 1530 at 2.) In making this challenge, Washington made three arguments: (1) that the probable cause finding was based on a confidential informant's tip, and there was insufficient indica of the informant's reliability; (2) that the affidavit contained material omissions; and (3) that the K-9 officer's dog sniff was unreliable and was itself an unlawful search. (*Id.*)

The Court focuses just on Washington's third ground of attack—the dog sniff alert on the Lincoln MKZ by the K-9 officer, Zippo. As Judge Docherty correctly noted, "if all the affidavit contained was Zippo's positive alert to the Lincoln MKZ, that alone would be enough" to establish probable cause. (January 13 R&R at 8 (citing *United States v.*

[30] The exhibits for Christopher Washington were provided conventionally with the Court but were not labeled by exhibit number. The Court identifies these exhibits by the Bates Number on the front page of the exhibit. Page numbers reflect the PDF pagination.

*Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007);[31] *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999)).)

As background, Brooklyn Park Detective Jackson Jindra was investigating Washington for drug-trafficking activity. (Washington Ex. 00172353 at 3.) Detective Jindra knew from previous investigations that Washington lived in an apartment building at 28XX Colfax Avenue South in Minneapolis. (*Id*.) Detective Jindra went to the 28XX Colfax Avenue South property and spoke with the property manager, who confirmed that Washington was still a resident and drove a Lincoln MKZ that was parked in the building's garage. (*Id*. at 3–4.) Detective Jindra subsequently confirmed that the license number for the Lincoln MKZ in the 28XX Colfax Avenue South garage was registered to Washington. (*Id*. at 4.) The property manager provided Detective Jindra with a key to the building and gave him permission to move freely throughout the common areas of the property. (*Id*.) Zippo joined Detective Jindra in the parking garage, and subsequently alerted to the Lincoln MKZ.[32] (*Id*. at 5.) As mentioned above, Zippo is certified to detect various narcotics, but not fentanyl. (*Id*. at 4.)

---

[31] In *Donnelly*, the Eighth Circuit opined that "[a]ssuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, *standing alone*, gives an officer probable cause to believe that there are drugs present." 475 F.3d at 955 (emphasis added).

[32] The only other vehicle in the garage that Zippo alerted to was a Chevrolet Impala, which Detective Jindra knew to be driven by Washington's girlfriend. (Washington Ex. 00172353 at 4–5.)

To the extent that Washington challenges Zippo's reliability, the Court agrees with Judge Docherty's analysis that Zippo's dog sniff was sufficiently reliable to confer probable cause. (January 13 R&R at 7.) Thus, Washington's motion turns on whether Detective Jindra and Zippo had permission to be in the 28XX Colfax Avenue South parking garage based on the property manager's consent. Washington argues that Detective Jindra and Zippo did not have consent to be in the garage. (ECF No. 1530 at 2 (citing *Georgia v. Randolph*, 547 U.S. 103, 122–23 (2006) and *State v. Licari*, 659 N.W.2d 243, 251 (Minn. 2003)); *see also* ECF No. 1687 at 2–3 (same).) The Court addresses each of these authorities relied on by Washington, in turn.

First, Washington is correct insofar as he claims that the United States Supreme Court held in *Randolph* that "[a] physically present defendant has the right to consent to a search even if authorized by a third party." (ECF No. 1530 at 2 (citing 547 U.S. at 122–23).) But Washington's argument that *Randolph* applies here because "he was physically present [in the garage] at the time of the search (as evidenced by the presence of his vehicle in the parking garage)" exceeds all reasonable extensions of the Supreme Court's reasoning. (ECF No. 1687 at 2 (parenthetical in original).)

In *Randolph*, the defendant and his separated wife were each present, in-person at their marital residence when the officer arrived asking to search the home for evidence of drug-trafficking activity. 547 U.S. at 107. Although the wife gave the officer permission to search the home, the defendant "unequivocally refused." *Id*. Despite the defendant's

emphatic rejection of the officers' request, the officer searched the home pursuant to the separated wife's consent. *Id*. The defendant moved to suppress evidence obtained from the search. *Id*. The Supreme Court narrowly determined that "a *physically present* inhabitant's *express refusal* of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id*. at 122–23 (emphasis added).

Here, Washington was neither "physically present" in the shared garage nor did he "express[ly] refus[e]" to consent to a dog sniff of his vehicle. The fact that his vehicle was physically present in the garage does not change the analysis. Taken to its logical extreme, accepting Washington's reasoning would mean that if a criminal defendant maintains contraband in a shared property, the defendant could deny any consent given by a physically present co-occupant for the search of the property for that contraband, even when the defendant is personally absent. Such a result would directly contravene binding Supreme Court precedent from *United States v. Matlock*, which considered that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." 415 U.S. 164, 170 (1974). But even if the Court accepted Washington's physical presence argument, there is nothing in the record whatsoever to suggest that Washington "unequivocally refused" consent for a dog sniff of the exterior of his vehicle. *Cf. Randolph*, 547 U.S. at 107.

Second, Washington's citation to *Licari* is similarly unavailing. As an initial matter, the Court agrees with Judge Docherty that "[f]ederal law, not state law, governs the

admissibility of evidence in federal court." (January 13 R&R at 8 (citing *United States v. Bell*, 54 F.3d 502, 503–04 (8th Cir. 1995)).) But even if the Court accepted Washington's argument that *Licari* is relevant because the "warrant was plainly issued by a *State* Court Judge in violation of *State* law" (ECF No. 1687 at 3 (emphasis in original)), the Court deems *Licari* to be distinguishable.

In *Licari*, the defendant maintained a rental unit in a shared storage facility. 659 N.W.2d at 247. The landlord for the facility had a contractual right to inspect rented units within the facility. *Id*. Pursuant to that contractual right, the landlord consented to unlocking the defendant's storage unit for police to inspect the unit. *Id*. ("[The landlord] unlocked the outer gate surrounding the facility and then *removed the lock from the door* to [the defendant's] unit." (emphasis added)). The Minnesota Supreme Court held that the landlord did not have actual or apparent authority to consent to the police searching the locked, private storage unit. *Id*. at 250 ("We hold that [the defendant] had a reasonable expectation of privacy in the storage unit and that he has the capacity to challenge the constitutionality of the search of the unit based upon the consent of the facility manager.").

By contrast, Washington's Lincoln MKZ was not in an individual unit blocked off from others by a locked door, but rather was in a shared parking garage accessible to residents of the property. (Washington Ex. 00172353 at 4 (noting that "Washington parks [the Lincoln MKZ] in the underground garage in random parking spots").) As Judge

Docherty noted, "Washington has not shown that he had any ability to exclude others from the garage the way he would be able to exclude others from his own apartment." (January 13 R&R at 9.) In *State v. Luhm*, the Minnesota Court of Appeals adopted the Eighth Circuit's formulation that "a property manager may consent to a search of the common areas of a multi-unit residential building that are under the property manager's control." 880 N.W.2d 606, 614 (Minn. Ct. App. 2016) (citing *United States v. Esparza*, 162 F.3d 978, 980 (8th Cir. 1998)). In key language, the *Luhm* court considered *Licari* to be "distinguishable because the manager consented to a search of the interior of an individual storage unit, not a search of a common area[] used by multiple tenants and under the control of the manager." *Id*. (citing *Licari*, 659 N.W.2d at 250–52). Because the parking garage here was "a common area[] used by multiple tenants and under the control of the manager," the Court concludes that *Luhm*—and not *Licari*—controls. Thus, even if the Court were to consider state law in its analysis, the warrant was not issued in violation of Minnesota state law.

Because Detective Jindra had the property manager's consent to be present in the parking garage, and Zippo's alert was sufficiently reliable to indicate the presence of narcotics in the Lincoln MKZ, the warrant to implement a tracker device on Washington's vehicle was based on probable cause.

**D.      Brown's Motion to Dismiss Count One of the Third Superseding Indictment (ECF No. 1335.)**

Brown moves to dismiss Count One of the Third Superseding Indictment[33] for failure to state an offense under Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure. (ECF No. 1335.) Brown originally argued that the Third Superseding Indictment failed to state an offense under the elements of 18 U.S.C. Section 1962(c), but amended his argument to state that the Third Superseding Indictment failed to state an offense under the elements of 18 U.S.C. Section 1962(d). (ECF No. 1556 at 2.) Specifically, Brown challenges that the Third Superseding Indictment "does not allege any 'agreement to participate in the conduct of the enterprise' on [his] part, nor does [it] indicate that [he] 'agreed to facilitate the racketeering endeavor.'" (*Id.* (citing *United States v. Salinas*, 522 U.S. 52, 63, 65 (1997)).)

The Court concludes that the Third Superseding Indictment provides a sufficient statement of the RICO conspiracy offense charged in Count One. *See United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995) ("Indictments are normally sufficient unless no reasonable construction can be said to charge the offense." (citation omitted)). Reasonably constructed, the Third Superseding Indictment alleges that Brown agreed to participate in the conduct of the enterprise and that he agreed to facilitate the enterprise's

---

[33] Brown brought his motion to dismiss as to the Second Superseding Indictment (ECF No. 820), but the government has since filed an updated Third Superseding Indictment with minor revisions. (ECF No. 1708.) The Court thus treats Brown's motion as moving to dismiss the Third Superseding Indictment.

racketeering activities. (*See* ECF No. 1708 at 3, 6–8, (alleging that Brown was a member and associate of the Highs and listing the "manner and means by which the members and associates of the enterprise agreed to conduct and participate in the conduct of the affairs of the Enterprise"); *see also id*. at 9 ("It was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.").) Under the permissive pleading standards of Rule 12(b)(3)(B)(v), that is sufficient for the government to state a RICO conspiracy offense.

## II.    Non-Dispositive Motions Warranting Supplemental Analysis

### A.    *Serrano's Motion for Leave to Join Motion to Suppress Filed by Defendant Ja'darius Wright (ECF No. 1326.)*

Serrano moves for leave to join Ja'darius Wright's motion to suppress, docketed at ECF No. 1036. (ECF No. 1326.) As discussed above, the Court denied Wright's motion to suppress in its February 25 Order. (February 25 Order at 29 (denying ECF No. 1036).) Thus, Serrano's motion to join Wright's motion at ECF No. 1036 is denied as moot.

### B.    *Lockhart's, Lesure's, and Serrano's Motions to Sever Counts of the Third Superseding Indictment (ECF Nos. 1293, 1313, 1328, 1373.)*

Lockhart, Lesure, and Serrano each brought combined motions to sever counts and parties named in the Third Superseding Indictment.[34] (ECF Nos. 1293, 1313, 1328,

---

[34] Lockhart, Lesure, and Serrano brought their motions pursuant to the Second Superseding Indictment. The Court treats the motions as being brought under the since-filed Third Superseding Indictment.

1373.[35]) In the Court's December 11 Order, the Court denied each of these motions without prejudice to the extent that the motions sought to sever parties, but the Court kept the motions under advisement to the extent that the motions sought the severance of counts. (December 11 Order at 24–25.) Judge Docherty did not address these motions in the December 27 Order; the Court addresses them now.

Lockhart and Lesure argue that Counts One and Three of the Third Superseding Indictment (that they are charged with) should be severed from the other counts that they are not charged with under Rules 8 and 14 of the Federal Rules of Criminal Procedure. (ECF Nos. 1293, 1313, 1373.) Serrano similarly argues that Count Three (that he is charged with) should be severed from the other counts that he is not charged with. (ECF No. 1328.)

But a motion to sever counts joined under Rule 8(a) is a procedural device to challenge the joinder of counts that are charged against the *same defendant* into separate trials; it is not a tool to challenge the joinder of counts brought against *different defendants* in the same trial. *See* Fed. R. Crim. P. 8(a) ("The indictment . . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."). The proper procedural device for doing

---

[35] Lockhart brought duplicative severance motions at ECF No. 1293 and ECF No. 1373. The Court analyzes the motions together.

so is a motion to sever parties joined under Rule 8(b)—and the Court already denied the Rule 8(b) motions of Lockhart, Lesure, and Serrano. (December 11 Order at 6–11.)

Likewise, insofar as Lockhart, Lesure, and Serrano argue for the severance of counts under Rule 14(a), the Court reiterates its reasoning discussed in the December 11 Order that the Defendants have not made a sufficient showing of undue prejudice to justify severance. (December 11 Order at 16–21.) The Court thus denies without prejudice the remainder of Lockhart's, Lesure's, and Serrano's motions to sever.

## C.    *Ketter's Motion to Join Co-Defendant Motions (ECF No. 1327.)*

Ketter moved to adopt various motions filed by his co-defendants. (ECF No. 1327.) The Court previously granted Ketter's motion as to the adoption of his co-defendants' motions docketed at ECF Nos. 963 and 1051, and denied Ketter's motion without prejudice to the extent it adopted those two motions. (December 11 Order at 25.) The Court otherwise kept Ketter's motion under advisement. (*Id.*)

The Court now denies Ketter's motion as moot as to the adoption of the co-defendant motions docketed at ECF Nos. 961, 962, 1049, 1050, 1074, 1076, and 1091. The Court has already denied each of these motions, which renders moot the relief that Ketter requests. (*See* December 3 Order at 39–40 (accepting ECF No. 1391 and affirming ECF No. 1392).) The Court also denies Ketter's motion as moot as to the adoption of the motion docketed at ECF No. 1060, as that motion was brought by Clinton Brown, who has since pled guilty. (ECF No. 1461.) The Court grants Ketter's motion as to the adoption of the

34

motions docketed at ECF Nos. 1052 and 1073, and thus keeps Ketter's motion under advisement to the extent that it adopted these open motions that Judge Docherty reserved for the trial court. (ECF. No. 1392 at 25–26.)

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Defendants' Objections to the Reports and Recommendations (ECF Nos. 1648, 1654, 1686, 1655, 1650, 1653, and 1645) are OVERRULED;

2.    The Report and Recommendations (ECF Nos. 1616, 1638, 1697) are ACCEPTED;

3.    Lockhart's Appeal of the December 27 Order (ECF Nos. 1651) is DENIED;

4.    The December 27 Order (ECF No. 1612) is AFFIRMED;

5.    Ronnell Lockhart's Motions for Severance (ECF Nos. 1293 and 1373) are DENIED without prejudice to the extent that the motions seek severance of counts;

6.    Robert Lesure's Motion for Severance (ECF No. 1313) is DENIED without prejudice to the extent that the motion seeks severance of counts;

7.    Carlos Serrano's Motion for Severance (ECF No. 1328) is DENIED without prejudice to the extent that the motion seeks severance of counts; and

8.      Ernest Ketter's Motion for Leave to Adopt Motions Filed by Co-Defendants (ECF No. 1327) is GRANTED as to the adoption of the motions docketed at ECF Nos. 1052 and 1073, but is DENIED as moot as to the adoption of the motions docketed at ECF Nos. 961, 962, 1049, 1050, 1060, 1074, 1076, and 1091.

Dated: March 4, 2025                         BY THE COURT:

                                          s/Nancy E. Brasel
                                          Nancy E. Brasel
                                          United States District Judge