UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-160 (NEB/JFD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S** |
| | ) | **CONSOLIDATED** |
| TYREESE GILES (6), | ) | **MOTIONS IN LIMINE** |
| | ) | |
| JOSIAH TAYLOR (7), | ) | |
| | ) | |
| TREVAUN ROBINSON (10), | ) | |
| | ) | |
| WILLIAM BANKS (19), | ) | |
| | ) | |
| GREGORY BROWN (26), | ) | |
| | ) | |
| MARQUES WALKER (27), | ) | |
| | ) | |
| Defendants. | | |

The United States of America by and through its attorneys, Lisa D. Kirkpatrick, Acting United States Attorney for the District of Minnesota, and Assistant United States Attorneys Thomas Calhoun-Lopez and Carla J. Baumel, and David L. Jaffe, Chief of the Violent Crime and Racketeering Section of the Department of Justice, and Trial Attorneys Brian W. Lynch and Alyssa Levey-Weinstein, respectfully submits its first consolidated motions in limine in connection with the trial that begins on May 12, 2025 for the above named defendants.

1

1. ***Government's First Motion—Motion to Admit Self-Authenticating & Certified Records***

The United States respectfully moves this Court for an Order admitting, or conditionally admitting, several self-authenticating records as outlined herein pursuant to Fed. R. Evid. 902(11) (Certified Domestic Records of a Regularly Conducted Activity) and Fed. R. Evid. 902(4) (Certified Copies of Public Records).

These self-authenticating records fall into several categories addressed below. First, the United States intends to offer social media records, flight records, financial and domiciliary data, cell phone carrier data, documents from the Minnesota Department of Corrections, video surveillance, and other media (e.g., 911 calls) through certificates of authenticity obtained from records custodians in accordance with Fed. R. Evid. 902(11). Second, the United States intends to offer copies of tax documents obtained from the United States Internal Revenue Service and filings obtained from the Minnesota Secretary of State. Each of these documents have been certified as correct by those respective agencies' custodians under Fed. R. Evid. 902(4).[1]

---

[1] "[O]nce the offering party has met its burden of establishing the foundational requirements of the business records exception, the burden shifts to the party opposing admission to prove inadmissibility by establishing sufficient indicia of untrustworthiness. *Shelton v. Consumer Products Safety Comm'n*, 277 F.3d 998, 1010 (8th Cir. 2002) (citing *Kehm v. Proctor & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir.1983)).

Accordingly, each of these documents require no extrinsic evidence of authenticity in order to be admitted.

On April 28, 2025, the United States met and conferred with counsel for the defendants regarding the admission of business records with certifications—counsel agreed to the general framework of admitting records in this manner. For purposes of streamlining the admission of evidence in this matter, the United States seeks a ruling in limine that these records are admissible under Rule 902(11) and 902(4), respectively.

      a.     *Social Media Records.*

Consistent with the manner in which the United States introduced evidence at the previous trial in this case, the United States intends to offer records obtained from Meta Platforms, Inc. (Facebook, Instagram, and Snapchat) pursuant to Fed. R. Evid. 902(11). Social media records are commonly authenticated in a two-part fashion. First, the records must be authenticated as true and correct copies of records from the platform (i.e., Meta). Second, the records from that account must be linked to a purported user. This dual layer authentication recognizes that "authentication of social media evidence presents some special challenges because of the great ease with which a social media account may be falsified or a legitimate account may be accessed by an imposter." *United States v. Perez*, 61 F.4th 623, 626 (8th Cir. 2023) (citing *United States v. Lamm*, 5 F.4th 942, 947 (8th Cir. 2021)).

Here, consistent with previous trial practice in this matter, the United States moves in limine to conditionally admit social media records pursuant to Fed. R. Evid. 902(11) based on certificates obtained from the social media companies' records custodians.[2] The United States understands that this admission is "conditional" insofar as the United States must then link these accounts to the individuals to which the United States purports they belong. In other words, in addition to the corresponding certifications, the United States will elicit testimony at trial from a witness with knowledge to connect social media accounts to those accounts' holders. *Perez*, 61 F.4th at 626 (noting that "a party may authenticate social media evidence with circumstantial evidence that adequately links a particular person to the social media account.").

Specifically, evidence at trial will link several Facebook accounts to Highs members and associates, including the defendants, via account holder information and witness testimony. Regarding account holder information, the United States will point to the records themselves to link the account to a

<hr>

[2] What the United States requests, therefore, is consistent with this Court's previous decision, in which it concluded "that such records are self-authenticating insofar as they purport to be account records from Meta Platforms with the listed account names and registration information. But beyond this threshold determination, the government bears the burden of showing at trial that each account is actually associated with the individuals that they claim the accounts are associated with." *See* ECF No. 1810 at 4.

specific user.  *See United States v. Recio*, 884 F.3d 230, 237 (4th Cir. 2018) (finding the defendant's Facebook account authenticated where "(1) the user name associated with the account was 'Larry Recio,' (2) one of the four email addresses associated with the account was 'larryrecio20@yahoo.com,' (3) more than one hundred photos of Recio were posted to the account, and (4) one of the photos posted to the user's timeline was accompanied by the text 'Happy Birthday Larry Recio' ").

The United States will also elicit testimony from several cooperating defendants that profile and selfie-style photos posted to the accounts depict known Highs members, including the defendants, and that the cooperating defendants have, on multiple occasions, interacted with the defendants using their known Facebook accounts. Testimony both from cooperating defendants and case agents will also include information about the defendants' aliases within the Highs criminal enterprise, which further ties them to their specific accounts.  The following exhibits have been marked and made available to the defendants for purposes of trial:

- T-1    Certificate of Authenticity - Facebook Return, Calvin Wright
- T-2    Certificate of Authenticity - Facebook Return, Christopher Finch
- T-3    Certificate of Authenticity - Facebook Return, Clinton Brown
- T-4    Certificate of Authenticity - Facebook Return, Dantrell Johnson
- T-5    Certificate of Authenticity - Facebook Return, Deshaun Morris
- T-6    Certificate of Authenticity - Facebook Return., Douglas Mobley
- T-7    Certificate of Authenticity - Facebook Return, Gregory Hamilton
- T-8    Certificate of Authenticity - Facebook Return, Jarrett Robinson
- T-9    Certificate of Authenticity - Facebook Return, Matthew Robinson

- T-10 Certificate of Authenticity - Facebook Return, Randy Tate
- T-11 Certificate of Authenticity - Facebook Return, Trevoneia Felton
- T-12A Certificate of Authenticity - Facebook Return, Tyrese Giles
- T-12B Certificate of Authenticity - Instagram Return, Tyrese Giles
- T-13 Certificate of Authenticity - Facebook Return, William Johnson
- T-35 Certificate of Authenticity - Facebook Return, Keon Pruitt
- T-36 Certificate of Authenticity - Facebook Return, Avante Nix
- T-42 Certificate of Authenticity - Facebook Return, Josiah Taylor
- T-43 Certificate of Authenticity - Facebook Return, C. Lee Washington
- T-44 Certificate of Authenticity - Facebook Return, Damone Rhoades
- T-46 Certificate of Authenticity - Facebook Return, Trevaun Robinson
- T-47 Certificate of Authenticity - Facebook Return, Gregory Brown (T2)
- T-48 Certificate of Authenticity - Facebook Return, Deondre Barnes
- T-49 Certificate of Authenticity - Facebook Return, Malcom Samuels
- T-50 Certificate of Authenticity - Facebook Return, Cortez Blakemore
- T-53 Certificate of Authenticity - Instagram Return, Montez Brown
- T-54 Certificate of Authenticity - Facebook Return, Montez Brown
- T-56 Certificate of Authenticity - Facebook Return, Cortez Blakemore

> b. *Airline Carrier Data.*

The United States intends to offer, via summary exhibits, flight records for several indicted co-conspirators during the relevant period of the charged RICO conspiracy (the United States has separately moved for admissibility of the summary exhibit under Fed. R. Evid. 1006, *infra*). Flights records from Delta Airlines, American Airlines, Sun Country Airlines, and United Airlines will show that various Defendants, indicted co-conspirators, and unindicted co-conspirators facilitated their drug trafficking activities through commercial airlines flights between Minnesota and Arizona (their source for fentanyl). The following exhibits have been marked and made available to the defendants for purposes of trial:

6

- T-26  Certificate of Authenticity - Delta Airlines
- T-27  Certificate of Authenticity - American Airlines
- T-28 Certificate of Authenticity - Sun Country Airlines
- T-29  Certificate of Authenticity - United Airlines
- T-30  Certificate of Authenticity - Delta Airlines
- T-31  Certificate of Authenticity - Sun Country Airlines

c. *Financial and Domiciliary Information.*

The United States intends to introduce at trial financial and domiciliary information to prove the defendants' and their co-conspirators' involvement in sourcing and trafficking narcotics on behalf of the Highs criminal enterprise. These financial documents include data from personal banking accounts, business accounts, peer-to-peer transaction platforms, asset purchase agreements, lending institutions, and employment records. At trial, the government will use these records to show the movement and volume of illicit cash proceeds that the defendants obtained from their drug trafficking activities. The data also tends to establish the roles these individauls played within the broader Highs criminal enterprise. Drug trafficking expert BCA SA Mike Flanagan will further explain that drug traffickers often compartmentalize aspects of their business including the organization, storage, and sharing of drug profits. Finally, the records will also be used to undermine any potential claim of legitimate source revenue from lawful employment. The following exhibits have been marked and made available to the Defendants for purposes of trial:

- T-57 Certificate of Authenticity - Marty's Auto Purchase Records
- T-58 Certificate of Authenticity - Luther Brookdale Purchase Records
- T-59 Certificate of Authenticity - TD Auto Finance Purchase Records
- T-62 Certificate of Authenticity - Mondelez Employment Records
- T-63 Certificate of Authenticity - Capri Jewelers Records
- T-65 Certificate of Authenticity - PNC Bank Records
- T-66 Certificate of Authenticity - PNC Bank - Surveillance Records
- T-67 Certificate of Authenticity - Cash App Records (I)
- T-68 Certificate of Authenticity - Cash App Records (II)
- T-69 Certificate of Authenticity - Zazapaws Records (US Bank)
- T-70 Certificate of Authenticity - Bancorp Records (I)
- T-71 Certificate of Authenticity - Bancorp Records (II)
- T-73 Certificate of Authenticity - Cash App Records (III)
- T-74 Certificate of Authenticity - Cash App Records (IV)
- T-75 Certificate of Authenticity - Cash App Records (V)
- T-76 Certificate of Authenticity - Cash App Records (VI)
- T-80 Certificate of Authenticity - Veridian Records
- T-81 Certificate of Authenticity - UNFI Employment Records

In addition, several records that will be offered at trial connect the defendants to addresses to which they were associated during the time of the RICO and drug trafficking conspiracies. These attribution records will connect the defendants to phone numbers, email addresses, and/or residential addresses that they used or listed to purchase flights (to source narcotics), ship parcels (containing narcotics), or store their product (stash houses). These records will also link the defendants to both indicted and unindicted co-conspirators that were involved in the narcotics trafficking of the Highs enterprise. These co-conspirators will appear in several devices and social media accounts that link the defendants to each other and their narcotics sources. The identities of these individuals will also be important to

8

understand peer-to-peer transaction data (i.e., CashApp) showing the flow of money among the traffickers.  The following exhibits have been marked and made available to the Defendants for purposes of trial:

- T-39  Certificate of Authenticity - Google (standonit443@gmail.com)
- T-60  Certificate of Authenticity - Equifax Records
- T-61  Certificate of Authenticity - Albosaad Rental Records
- T-72  Certificate of Authenticity - Cingular Wireless
- T-77  Certificate of Authenticity - Airbnb Records
- T-78  Certificate of Authenticity - FedEx Records

d.      *Carrier Data and Information.*

The United States intends to introduce at trial the expert testimony of FBI Cellular Analysis Survey Team ("CAST") SA Randy Larkin.  SA Larkin's testimony will explain cellular device data obtained from various phone providers from the night Josiah Taylor murdered Harvey Williams.  This data will connect Mr. Taylor to the vehicle involved in the shooting and will further establish Mr. Taylor's presence near the crime scene at the time of the murder. The following exhibits have been marked and made available to the defendants for purposes of trial:

- T-40  Certificate of Authenticity - T-Mobile - (Call Nos. 651-278-0716 & 651-336-8054)
- T-41  Certificate of Authenticity - T-Mobile - (Call Nos. 612-407-3246, 612-459-0168, & 612-703-6754)

e.      *Minnesota Department of Corrections (DOC) Records.*

Records from the Minnesota Department of Corrections will be introduced as to defendant Trevaun Robinson with respect to evidence of his

9

Highs gang related tattoos (i.e., evidence that Mr. Robinson in associated with the alleged Highs enterprise). These tattoos are intrinsic evidence of enterprise—a routine form of evidence in street gang RICO trials. *United States v. Quinn*, 131 F.4th 846, 857 (8th Cir. 2025) ("The group identified its members through recognizable hand signs, specific tattoos, and social media posts designed to demonstrate distinct affiliation in competition with other groups."). In addition, the intake documents reflect admissions from Mr. Robinson regarding his High enterprise affiliations. His statements embodied within those certified records are not hearsay. Fed. R. Evid. 801(d). The following exhibits have been marked and made available to the defendants for purposes of trial:

- T-64 Certificate of Authenticity- MN Dep't of Corr. - (1) T. Robinson Intake Documents (4.13.15 and 6.21.2018); (2) T. Robinson Tattoo Documents; (3) Offender Photo Report With All Mugshots - Robinson, Trevaun 246678.

 *f.   Medical Records.*

The United States will introduce medical records at trial in connection with two overt acts. First, the United States intends to introduce medical records of Tyreese Giles from September 9, 2021—the night he murdered Darien Berry. Those medical records will corroborate surveillance that shows that Mr. Giles was also shot during the shooting at Pennwood Market minutes before he was left in front of Hennepin County Medical Center. In addition,

the United States will introduce the medical records of two victims. The first, M.G., suffered severe injures as a result of glass that shattered from shots fired by Highs members, including Trevaun Robinson, in downtown Minneapolis on July 7, 2019. The second, A.M., suffered gunshot wounds from Trevaun Robinson following a vehicle collision in the Merwin Liquor's parking lot. These certificates include the following:

- T-24 Certificate of Authenticity - Hennepin County Medical Center (T. Giles)
- Y-9 Certificate of Authenticity - Hennepin County Medical Center (M.G.)
- UU(forthcoming) Certificate of Authenticity – North Memorial Health Hospital (A.M.)

       g.     *Video Surveillance, Media, and 911 Calls.*

The United States intends to offer surveillance video from businesses that captured relevant events from the charged conduct. These videos are admissible domestic records of a regularly conducted activity under Fed. R. Evid. 803(6) and have been authenticated via certifications provided under Fed. R. Evid. 902(11). The United States further anticipates offering 911 emergency calls in connection with shooting events that will be presented at trial. The 911 calls are admissible present sense impressions and excited utterances "regardless of whether the declarant is available as a witness." Fed. R. Evid. 803(1), (2). The following exhibits have been marked and made available to the Defendants for purposes of trial:

- T-14  Certificate of Authenticity - 1900 Glenwood Avenue

- T-15 Certificate of Authenticity - 1825 Glenwood Avenue (Wendy's House of Soul)
- T-16 Certificate of Authenticity - 916 W Broadway N (McDonalds)
- T-17 Certificate of Authenticity - 2024 N Lyndale Avenue (Salvation Army)
- T-18 Certificate of Authenticity - 626 W Broadway (Winner Gas)
- T-19 Certificate of Authenticity - 1821 Glenwood Avenue (Skyline Market)
- T-20 Certificate of Authenticity - 1840 N Penn Avenue (Wally's Foods)
- T-21 Certificate of Authenticity - Milestone
- T-22 Certificate of Authenticity - Minneapolis Police Department 911 Dispatch
- T-23 Certificate of Authenticity - Minneapolis Saint Paul Airport
- T-24 Certificate of Authenticity - Hennepin County Medical Center
- T-25 Certificate of Authenticity - 2125 Glenwood Av N (Pennwood Market)
- T-37 Certificate of Authenticity - 626 W Broadway (Winner Gas)
- T-38 Certificate of Authenticity - 328 W Broadway (4th Street Saloon)
- T-82 Certificate of Authenticity - Minneapolis Public Schools
- T-83 Certificate of Authenticity – MNDOT
- T-TBD Certificate of Authenticity – 4908 Humboldt Lane Surveillance
- T-TBD Certificate of Authenticity – 500 49th Ave N

h.      *Certified Copies – Tax Records and Secretary of State Records.*

The United States intends to offer certified copies of Gregory Brown's 2019-2023 tax documents obtained from the United States Internal Revenue Service. In addition, the United States will offer certain filings from Mr. Brown's purported dog breeding business obtained from the Minnesota Secretary of State. These documents will be used at trial to prove that Mr. Brown's cash income and spending were inconsistent with the legitimate income he reported through, for example, his alleged dog breeding business. Instead, the United States will prove at trial that Mr. Brown routinely falsified

his income as a cover for the illicit cash proceeds he earned through narcotics trafficking. Each of these documents have been certified as correct by those respective agencies' custodians under Fed. R. Evid. 902(4).

- A-182A Ex Parte Certified Tax Record - 2019 Form 1040 - Gregory Brown
- A-182B Ex Parte Certified Tax Record - 2020 Form 1040 - Gregory Brown
- A-182C Ex Parte Certified Tax Record - 2022 Form 1040 - Gregory Brown
- A-182D Ex Parte Certified Tax Record - Lack of Record Tax Years 2021, 2023 - Gregory Brown
- A-220 Secretary of State - Certified Records

2. ***Government's Second Motion—Crime Scene and Autopsy Photographs***

The United States respectfully moves this Court for an Order admitting certain crime scene and autopsy photographs related to the murders of Darien Berry and Harvey Williams. For each of these murders, the United States intends to offer crime scene photographs, surveillance, clips of law enforcement body camera footage, still shots from that body camera footage, and autopsy photographs at trial.

Under Rule 403, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. At trial, the Government intends to introduce crime scene photographs, clips of Minneapolis Police Department ("MPD") officers' body camera footage, clips of Hennepin County Sheriff's Office ("HCSO") deputies' body camera footage, still shots from body camera footage, and autopsy photographs at trial related to the murder of Harvey Williams and

13

Darien Berry. Furthermore, the United States intends to introduce MPD officers' body camera footage and still shots from the footage for the murder of Highs members Prince Martin and Jaylen Salter, which are foundational to the retaliatory murders of Darien Berry, Darryl Wells, and Harvey Williams. Similarly, the United States will admit surveillance footage and/or still shots depicting these murders to explain the retaliatory nature of violence between the Highs and Lows.

The body camera footage, still shots, autopsy photographs, and surveillance footage all have probative value. *See United States v. Simpson*, 44 F.4th 1093, 1098 (8th Cir. 2022). In *Simpson*, while prosecuting a kidnapping resulting in death, the government introduced photographs and video that depicted the victim's deceased body at the crime scene and his autopsy. *Id.* at 1096. The defendant appealed and asserted error for the admission of these exhibits. *Id.* at 1098. The Eighth Circuit disagreed, holding that both the photographs and videos had probative value that substantially outweighed any risk of unfair prejudice. *Id.*

Here, officers' body camera footage and still shots will corroborate testimony by officers, witnesses, and other evidence presented regarding the location of the victims' bodies upon law enforcement arrival, the condition of the victims at the time they received medical care, and the cause of their deaths. By showing the extensive nature of these victims' wounds when first

14

responders arrived, the images will corroborate the Government's evidence and are thus probative of the fact they were killed by the defendants.

In *Simpson*, the Eighth Circuit reasoned that the admitted autopsy photographs aided the medical examiner's testimony concerning the timing of the deceased's injuries. *Id*. The United States intends to call forensic pathologists with the Hennepin County Medical Examiner's Office. Similar to *Simpson*, the autopsy photographs will aid the jury in understanding the forensic pathologists' testimony concerning the nature and cause of Harvey Williams' and Darien Berry's deaths.

The United States plans to limit the number of crime scene, autopsy and still shots that will appear in the case. The presentation of the evidence relative to the Prince Martin, Jaylen Salter, and Darryl Wells murders will be succinct. Further, the United States has limited the body camera footage to the distinct footage necessary and probative to the Berry and Williams murders. The aggregate of this evidence is necessary and probative and does not serve merely to inflame the passions of the jurors. *Id*.; *citing United States v. Ingle*, 157 3.d 1147, 1153 (8th Cir. 1998).

3. ***Government's Third Motion—Co-Conspirator Statements***

The United States respectfully moves for an Order admitting co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E). The United States also moves to provisionally admit certain co-conspirator statements

subject to the government meeting its burden of proof for admission of such at trial. Categories of potential co-conspirator statements are addressed below (the list is not exhaustive).

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a statement made by a co-conspirator during and in furtherance of the conspiracy is not hearsay. In order for an out-of-court statement of a co-conspirator to be admissible, the Government must show by a preponderance of the evidence (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy. *United States v. Whitlow*, 815 F.3d 430, 434 (8th Cir. 2016); *see also United States v. Jorgensen*, 144 F.3d 550, 561–62 (8th Cir.1998); *United States v. Escobar*, 50 F.3d 1414, 1423 (8th Cir.1995). Although courts may consider the contents of the statements, the Government must produce independent evidence outside of the statements themselves to establish the existence of the conspiracy. *Id.* Notably, Rule 801(d)(2)(E) contains no notice requirement for pretrial disclosure of co-conspirator statements, nor does any case law or statute mandate such disclosure.

Using the procedures outlined in *United States v. Bell*, 573 F.2d 1040 (8th Cir. 1978), the Court may provisionally allow the introduction of co-conspirator statements at trial. Indeed, this is the favored approach in the

Eighth Circuit. Other circuits routinely conditionally admit such statements and have done so for years. *See, e.g., United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir. 1980) (trial courts permitted to conditionally admit co-conspirator statements during trial); *United States v. Jackson*, 627 F.2d 1198, 1218-19 (D.C. Cir. 1980) (approving an conditional admission procedure); *Bell*, 573 F.2d at 1044 (approving admission-subject-to-connection approach); *United States v. Vaught*, 485 F.2d 320, 323 (4th Cir. 1973) ("[T]he judge may, in his discretion, permit the introduction of evidence as to things said and done by an alleged co-conspirator subject to being connected up and followed by evidence of the existence of the conspiracy."); *United States v. Geaney*, 417 F.2d 1116, 1119-20 (2d Cir. 1969) (recognizing that the "practicalities of a conspiracy trial may require that hearsay be admitted 'subject to connection'"); *Beckwith v. United States*, 367 F.2d 458, 459-60 (10th Cir. 1966) (acknowledging discretion of trial court to permit co-conspirator statements subject to linking up after government introduced proof of conspiracy); *United States v. Aguirre-Parra*, 763 F. Supp. 1208, 1217 (S.D.N.Y. Apr. 18, 1991) ("The proper procedure is to determine the issues surrounding admissibility . . . during the trial, and, if necessary, outside the presence of the jury.").

In its Consolidated Order on the Report and Recommendation and Appeal of Order, this Court rejected as premature defendants Jarrett Robinson and Gregory Hamilton's evidentiary motions seeking to exclude co-conspirator

statements ("Defendants' Motions"). *See* ECF No. 1582 at 32-33. The Court noted that "in this Circuit, courts may 'conditionally admit a coconspirator statement subject to later proof of the conspiracy to satisfy the coconspirator rule and defer a final ruling on its admissibility until after hearing all evidence.'" *Id*. at 33; citing *United States v. Young*, 753 F.3d 757, 771 (8th Cir. 2014). The Court noted that the defendants' motions were premature and more properly presented in a motion in limine or motion at trial. *Id*. at 33. In fact, in the last trial in this case, the Court allowed the defendants to renew their motions after the government had presented its evidence of conspiracy, so it could properly determine whether the co-conspirator statements were appropriate. The Government requests that the Court continue to follow this procedure in the subsequent trial.

To require the prosecution, at this stage, to identify all of the co-conspirator statements it intends to introduce at trial, as well as the various bases supporting their introduction, would be unwieldy, counterproductive, and contrary to the prevailing law and practice in any circuit, much less the Eighth Circuit. This is tantamount to providing the defense with a roadmap of the government's case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). However, for efficiency and clarity at trial, the United States provides notice of the following categories of co-conspirator statements that it intends to introduce at trial:

- *Lyrics from Rap Videos*

The United States intends to introduce several rap videos at trial. For example, a video labeled "Not from the Lows" by defendant Gregory Brown was posted to YouTube on January 17, 2021. (Third Superseding Indictment ("TSI"), Count 1, ¶ 8, Overt Act 52). The evidence at trial will show that Mr. Brown was part of the Highs conspiracy when the video was made and posted to YouTube. In "Not from the Lows," Mr. Brown utilized Highs phrases, referenced Highs cliques, paid tribute to deceased Highs members, and disrespected the Lows gang and members. Mr. Brown was surrounded by Highs members in the music video. He and others made numerous Highs hand signs. Moreover, Mr. Brown wore a sweatshirt that had "Low End" crossed off and contained Highs-related phrases. *See* Exhibit A, Pages 1-2. Mr. Brown's association with known Highs members and use of Highs related phrases is directly related to the Highs Enterprise alleged in count one of the TSI.

- *Social Media Posts and/or Direct Messages Involving Phrases Related to the Highs*

The United States intends to introduce social media records in which Highs members publicly posted phrases promoting their specific sect or "clique" of the Highs. Highs members created social media posts publicly identifying with their specific clique of the Highs. For example, on February 15, 2022, Highs member Jovan Knight ("Knight") posted publicly on Facebook "On Freeshots

I'm just now waking up . . ." *See* Exhibit A, Page 3. The United States intends to introduce evidence showing that Knight was a Freeshots member of the Highs and part of the conspiracy when he made this post and was publicly promoting a Highs clique. Mr. Knight's membership with the Highs and use of Highs-related phrases is directly related to the RICO Conspiracy Enterprise alleged in Count One of the TSI. (TSI Count 1, ¶ 3(c)).

- *Social Media Posts and/or Direct Messages Involving Phrases Related to Broadway*

The United States intends to introduce social media records in which Highs members publicly posted "Broadway." Highs members made social media posts about "Broadway" as a means to publicly associate and identify with the Highs. For example, on October 4, 2020, Highs member Randy Tate ("Tate") made a post titled "We was RAISED by MADE MEN but we MADE OURSELVES . . . #BROADWAY" with a photograph of him and two Highs members at the Winner Gas Station. *See* Exhibit A, Page 4. The United States will produce evidence that Tate was a Highs member at the time of this post. Mr. Tate's membership and post are relevant and intrinsic evidence related to the RICO Conspiracy Enterprise alleged in count one of the TSI. (TSI Count 1, ¶ 3(d)).

- *Social Media Posts and/or Direct Messages Involving Phrases Related to the Highs Enterprise*

The United States intends to introduce social media records in which Highs members publicly posted phrases related to "High-End" or the Highs. For example, on May 26, 2019, Highs member Randy Tate made a public Facebook post titled "Good time with the FAMILY YALL KNOW HOW WE COMIN WHEN WE GET TOGETHER . . .#HIGHEND #THE MOBB . . . ." *See* Exhibit A, Page 5. Mr. Tate was a Highs member and part of the conspiracy at the time of this post. His membership and post are relevant and in furtherance to the RICO Conspiracy Enterprise alleged in Count One of the TSI. (TSI Count 1, ¶ 3(d)).

- *Social Media Posts and/or Direct Messages Involving Phrases Related to Deceased Members*

The United States intends to introduce social media records in which Highs members publicly posted the names of deceased fellow members as a tribute. Highs members made social media posts about Jamarius Shief, a/k/a "Boosie," Prince Martin, a/k/a "Boo," and other deceased members as a means to publicly associate and identify with the Highs. For example, on August 14, 2021, Highs member Randy Tate made a public Facebook post titled "We in our own LANE . . . for BOOSIE—BOO—BROADWAY #FAMILY . . . A GANG." *See* Exhibit A, Page 6. Tate's membership and post are relevant evidence to the RICO Conspiracy Enterprise alleged in count one of the TSI. (TSI Count 1, ¶ 3(e)).

- *Social Media Posts and/or Direct Messages Involving Tributes to Deceased Members*

The Government intends to introduce social media records in which Highs members publicly posted the names of deceased fellow members as a tribute. Highs members made these tributes to deceased Highs members, such as Jaylen Salter, a/k/a "Munna," Jamarius Shief, a/k/a "Boosie," Prince Martin, a/k/a "Boo," and other deceased members as a means to publicly associate and identify with the Highs. For example, on October 31, 2021, Defendant Tyreese Giles made a public Facebook post titled "Miss yo crybaby ass . . . #LLMunna #BG." *See* Exhibit A, Page 7. Giles was a Highs member at the time of this post. The Government intends to introduce evidence that "LLMunna" signifies "Long Live Munna," which is a tribute to deceased Highs member Jaylen Salter. The Government intends to produce evidence that "#BG" signifies "Bodygang," which is a clique of the Highs gang. Giles' membership and post are relevant to the RICO Conspiracy enterprise alleged in count one of the TSI. (TSI Count 1, ¶ 3(e)).

- *Co-Conspirator Testimony Including Co-Conspirator Statements Made by Highs Members or Associates*

The United States intends to introduce numerous co-conspirator statements from many witnesses. This includes several cooperating witnesses who had communications with the defendants and their co-conspirators concerning murder, assault, robbery, kidnapping, drug trafficking, fraud, arson, and other

conduct undertaken on behalf of and in furtherance of the Highs Enterprise. Furthermore, this includes conversations generally related to the Enterprise, its structure, its purpose, manner and means, and pattern of racketeering activity.

- *Social Media Direct Message and Text Message Conversations Between Highs Co-Conspirators*

The United States intends to introduce social media direct message and text message conversations between co-conspirators involved in Highs drug trafficking, one of the racketeering activities alleged agreed to by members and associates of the Enterprise. The text message conversations are between Highs members and/or between Highs members and Arizona-based fentanyl suppliers about re-supply of fentanyl pills for sale in the Minneapolis area. They are relevant and in furtherance to the RICO Conspiracy Enterprise alleged in count one of the TSI. (TSI Count 1, ¶ ¶ 4, 5, and 6). Further, Count 2 of the TSI alleges a drug conspiracy involving Highs members and associates. These text messages are in furtherance of that conspiracy and relevant to it. (TSI Count 3).

4. ***Government's Fourth Motion—Impeachment of the Defendants***

The United States respectfully moves for a pretrial ruling granting the United States permission to introduce the Defendants' prior felony convictions for the limited purpose of impeaching their credibility if they elect to testify in

23

this trial. Where, as here, the credibility of a testifying defendant is a key consideration in the case, the United States may use a defendant's prior felony convictions to impeach his/her credibility. In this case, the United States anticipates that if the defendants choose to testify, they will offer testimony that directly contradicts the testimony of other witnesses. Accordingly, credibility will be a key factor in this case.

The defendants' convictions are "highly probative of [their] credibility 'because of the commonsense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath.'" *United States v. Headbird*, 461 F.3d 1074, 1078 (8th Cir. 2006) (overruled on other grounds). The Eighth Circuit has approved the use of felony convictions to impeach testifying defendants under Federal Rule of Evidence 609(a)(1)(B). *See, e.g., United States v. El-Alamin*, 574 F.3d 915, 926 (8th Cir. 2009); *United States v. Jackson*, 310 F.3d 1053, 1054 (8th Cir. 2002); *United States v. DeVore*, 839 F.2d 1330, 1333 (8th Cir. 1987); *United States v. Jackson*, 696 F.2d 578, 589 (8th Cir. 1982); *United States v. Brown*, 956 F.2d 782, 787 (8th Cir. 1992); *United States v. Crawford*, 130 F.3d 1321, 1323 (8th Cir. 1997).

In affirming the district court's decision to admit proof of prior convictions for impeachment of testifying defendants, the Eighth Circuit has noted that the probative value of such impeachment evidence is particularly

24

high where, as here, the jury will be asked to determine the credibility of competing stories by the defendant and the government's witnesses. As the Court in *Headbird* stated: "Credibility was a key factor in the jury's consideration of the case. Defense and government witnesses presented contradictory testimony regarding possession of the firearm, and possession was the only contested element of the offense." 461 F.3d at 1078. Other Eighth Circuit cases confirm the probative nature of prior convictions for impeachment purposes where credibility is a central issue. *Crawford*, 130 F.3d at 1323 ("Credibility was at the heart of the jury's fact finding responsibility since possession was the critical issue. The probative value of the evidence was therefore significant. . . ."); *DeVore*, 839 F.2d at 1333 (the "[defendant's] credibility as a witness was central to the jury's resolution . . ."); *Jackson*, 696 F.2d at 589 (noting that the probative value of the prior conviction "was further enhanced by the critical role that [defendant's] credibility would have played in this case if he had chosen to testify"); *Brown*, 956 F.2d at 787 (noting that because the jury "had to choose between one version of the events presented by the government's witnesses and another version presented by defendant's," credibility was necessarily a "critical factor in jury's choice," and the defendant's prior burglary conviction was "highly probative" on the issue of credibility).

The United States respectfully requests the opportunity to cross-examine the defendants regarding their prior felony conviction should they testify. The United States intends to limit its cross-examination to the fact and nature of the defendants' prior offenses as approved by the Eighth Circuit in *Headbird*. 461 F.3d at 1078.

The United States contends that the following convictions are admissible pursuant to Fed. R. Evid. 609:

a. *Josiah Taylor*.

- 2018 Conviction of Possession of Ammunition / Firearm by Prohibited Person, Hennepin County District Court, Case No. 27-CR-16-27611.

b. *Gregory Brown*.

- 2014 Conviction of Second Degree Assault, Hennepin County District Court, Case No. 27-CR-13-9524.

- 2015 Conviction of DWI, Ramsey County District Court, Case No. 62-CR-14-2434.

- 2018 Conviction of DWI, Hennepin County District Court, Case No. 27-CR-17-5758.

c. *Marques Walker*.

- 2009 Conviction of Conspiracy to Distribute and PWID Cocaine Base, U.S. District Court for the District of Minnesota, 8-cr-142-8.

- 2009 Conviction Felon in Possession of a Firearm, U.S. District Court for the District of Minnesota, 8-cr-142-8.

- 2016 Conviction of Escape, U.S. District Court for the District of Minnesota, 17-cr-276.

- 2021 Conviction of Identity Theft, Dakota County District Court, Case No. CR-18-1467.

d. *William Banks.*

- 2011 Conviction of Simple Robbery, Hennepin County District Court, Case No. 27-CR-10-51733.

- 2014 Conviction of Escape from Custody, Hennepin County District Court, Case No. 27-CR-14-2094.

- 2020 Conviction of Fifth Degree Drug Sale, Hennepin County District Court, Case No. 27-CR-19-5358.

- 2020 Conviction of Fifth Degree Drug Possession, Hennepin County District Court, Case No. 27-CR-19-5358.

- 2022 Conviction of Possession of Ammunition / Firearm by Prohibited Person, Hennepin County District Court, Case No. 27-CR-20-8309 .

e. *Trevaun Robinson.*

- 2015 Conviction of First Degree Aggravated Robbery, Hennepin County District Court, Case No. CR-15-9014.

- 2015 Conviction of Theft, Hennepin County District Court, Case No. CR 15-12521.

- 2021 Conviction of Second Degree Riot, Hennepin County District Court, Case No. CR 19-18529.

5. ***Government's Fifth Motion—Reference to Potential Punishment and to State Punishment***

The United States moves to preclude the defendants or their counsel, in the presence of the jury, from mentioning or referring to the potential

punishment the defendants may face if convicted. *See, e.g., Shannon v. United States*, 512 U.S. 573, 579 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"); *United States v. Fenner*, 600 F.3d 1014, 1023 n.7 (8th Cir. 2010) ("We agree with the Government that any reference to sentencing would have been improper."). Such information would not be relevant to the defendant's innocence or guilt and would present a substantial risk of unfair prejudice to the United States' case. *See* Fed. R. Evid. 403.

6. ***Government's Sixth Motion—Evidence Related to Discovery Issues***

The United States moves to preclude the defendants or their counsel, in the presence of the jury, from improperly presenting questions, evidence, references, or arguments concerning the procedural history of this case, including any discovery disputes. Here, the parties have litigated wide-ranging discovery disputes for nearly a year. These dipositive issues have been presented to the Court, decided by the Court, and are the law of the case. Issues litigated in the pre-trial posture are, therefore, irrelevant. Any evidence related to these matters, even if relevant, tend to cause the jury to unduly speculate and risk sowing unnecessary confusion. This evidence should be excluded.

**7.** *Government's Seventh Motion—Summary Charts*

The United States intends to present various summaries at trial. Each of these summaries will be used to prove the content of voluminous documents that cannot be conveniently examined in court. Rule 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. The Eighth Circuit recognizes that "[t]he use of summary charts, diagrams, and other visual aids is generally permissible in the sound discretion of the trial court." *United States v. Wainright*, 351 F.3d 816, 820 (8th Cir. 2003) (quoting *United States v. Preciado*, 336 F.3d 739, 745 (8th Cir. 2003)). The United States intends to introduce the following at trial:

- *Co-conspirators' Flight Data (Gov. Ex. A-69).*

Here, the United States seeks to introduce a summary exhibit reflecting flight records for several indicted and unindicted co-conspirators during the relevant window of the charged RICO conspiracy. The named co-conspirators whose flight information is reflected in this summary exhibit include: (1) Gregory Brown; (2) Montez Brown; (3) Calvin Wright; (4) Avante Nix; (5) Marques Walker; (6) Deandre Poe; (7) Robert Lesure; and (8) Ronnell Lockhart. Each of these individuals was involved in the trafficking and distribution of controlled substances in that in turn enriched leaders, members, and

associates of the Highs. The summary chart contains flight dates, passenger information, destination/origin information, and companion traveler identifications.

The data reflected within the summary exhibit is derived from subpoena returns provided by four airline carriers, including Sun Country Airlines, United Airlines, Delta Airlines, and American Airlines.[3] The subpoena returns for flight records from each of the aforementioned airlines are voluminous. Presenting flight record subpoena returns for each co-conspirator, from each airline, would risk confusing the jury and unnecessarily prolonging the trial. The summary should be admitted.

- *CashApp Transactions (Gov. Ex. A-172).*

The United States seeks to introduce a summary exhibit reflecting CashApp transaction records for several indicted and unindicted co-conspirators during the relevant window of the charged RICO conspiracy. The co-conspirators whose CashApp information is reflected in this summary exhibit include: (1) Gregory Brown; (2) Calvin Wright; (3) Avante Nix; (4) Marques Walker; (5) Deandre Poe; (6) Robert Lesure; (7) Ja'Darius Wright; and (8) Carlos Serrano. Each of these individuals were involved in the

---

[3] If it were to become necessary at trial to introduce these underlying subpoena records, the United States is prepared to do so through certificates of authenticity pursuant to Fed. R. Evid. 902(11) and through the testimony of IRS Special Agent Matthew Schommer.

trafficking and distribution of controlled substances that in turn enriched leaders, members, and associates of the Highs. The summary chart contains display name information, subscriber data (phone numbers and addresses), and transaction details (total dollars incoming, total dollars outgoing) among co-conspirators involved in this case.

The data reflected within the summary exhibit is derived from subpoena returns provided by CashApp.[4] The subpoena returns for the CashApp records from each of the aforementioned individuals are voluminous. Presenting transaction record subpoena returns for each co-conspirator would risk confusing the jury and unnecessarily prolonging the trial.

- *PNC Bank Transaction and ATM Data (Gov. Exs. A-163, A-164).*

The United States intends to introduce at trial two summary charts related to certain ATM deposits (both transactions and surveillance data, respectively) made by Marques Walker and other co-conspirators into an Arizona-based fentanyl distributor's bank account. Specifically, evidence at trial will show that Ja'Darius Wright sourced fentanyl from Arizona for Marques Walker and several co-conspirators who in turn supplied the Highs with narcotics. Marques Walker and other individuals deposited bulk cash

---

[4] If it were to become necessary at trial to introduce these underlying subpoena records, the United States is prepared to do so through certificates of authenticity pursuant to Fed. R. Evid. 902(11) and through the testimony of IRS Special Agent Sam Ebin.

into Mr. Wright's PNC Bank account on several occasions during the relevant time period of the conspiracy. The transaction chart summarizes outgoing and incoming funds from Mr. Wright's account. The surveillance summary chart summarizes specific transactions captured by PNC Bank's ATM surveillance system from a branch location in Roseville, Minnesota. Specifically, this chart summarizes transaction records in which Marques Walker and others can be seen on video depositing money into Mr. Wright PNC account. At trial the United States will prove that the individuals depositing money into Mr. Wright's account were involved in the trafficking and distribution of controlled substances that in turn enriched leaders, members, and associates of the Highs.

The data reflected within these summaries is derived from subpoena returns provided by PNC Bank.[5] The subpoena returns for the PNC Bank records are voluminous and presenting them for each transaction involving a co-conspirator would risk confusing the jury and unnecessarily prolonging the trial.

- *Postal Inspection Service Summaries (Gov. Ex. LL-2, RR-1).*

The United States intends to introduce at trial two summary exhibits

---

[5] If it were to become necessary at trial to introduce these underlying subpoena records, the United States is prepared to do so through certificates of authenticity pursuant to Fed. R. Evid. 902(11) and through the testimony of FBI Forensic Account Sarah Bruder.

related to packages mailed by Gregory Brown, Marques Walker, Deandre Poe, Ja'Darius Wright, and others to Minnesota for purposes of transporting narcotics. Specifically, evidence at trial will show that the defendants and their co-conspirators sourced fentanyl from Arizona. To transport fentanyl, the defendants or their co-conspirators mailed narcotics-laden packages to certain, strategic locations within the Twin Cities Metro area. For example, evidence at trial will show that Marques Walker worked with Ja'Darius Wright to ship over twenty, priority mail express packages from January of 2022 through April of 2022 from "Arizona Threads" to Mr. Walker's girlfriend's store in Brooklyn Park, "Shine Beauty." One of these parcels destined for Shine Beauty was seized on April 1, 2022—it contained over 3 kilograms of fentanyl.

These summaries from the postal service provide transaction details for parcels shipped to addresses of significance in this case—this parcel data includes origin information, destination information, postage price, photographs, mailing type, and parcel weight. The data reflected within the summary exhibits is derived from the investigation the United States Postal Inspection Service performed in this case. Inspectors Brent Brandner and Josh Bergeron will testify in connection with these records and their respective investigations. Because the underlying postal transaction data for these mailings are voluminous, and presenting them would unnecessarily prolong the trial, the United States moves to admit this evidence in summary form.

33

**8.** *Government's Eighth Motion—Defendants' Self-Serving Hearsay*

The United States moves to preclude any defendant or their counsel, in the presence of the jury, from offering or referring in any way to his own hearsay statements at trial during cross-examination or during their case-in-chief. Although Fed. R. Evid. 801(d)(2) allows the government to introduce a defendant's prior inculpatory statements as admissions by a party opponent, the defendants cannot offer their *own* self-serving exculpatory hearsay statements made to law enforcement or other witnesses through either direct or cross examination. Rule 801(d)(2) "does not extend to a party's attempt to introduce his or her own statements through the testimony of other witnesses." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (citing *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996)). If such statements were deemed admissible under Rule 801(d)(2), parties could "effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *Id.* (citing *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000)). "Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory statements does not increase the plausibility of the self-exculpatory statements." *Williamson v. United States*, 512 U.S. 594, 600 (1994).

34

Statements "collateral to a self-inculpatory statement" should not "be treated any differently from other hearsay statements that are generally excluded." *Id.*

Accordingly, the defendants should be precluded from referring to or offering self-serving out-of-court hearsay statements.

**9.** ***Government's Ninth Motion—Witness Plea Agreements and Cooperation Agreements***

The United States intends to offer the testimony of five cooperating witnesses in its case-in-chief. For each of these witnesses, the government intends to introduce the cooperating witness's guilty plea and cooperation agreement.

"In this circuit, a confederate's guilty plea or plea agreement is admissible on the government's direct examination of the witness as evidence of the witness' credibility or of his acknowledgement of participation in the offense." *United States v. Morris*, 327 F.3d 760, 761 (8th Cir. 2003) (quoting *United States v. Drews*, 877 F.2d 10, 12 (8th Cir. 1989)). This rule acknowledges that "[i]ntroduction of the entire plea agreement permits the jury to consider fully the possible conflicting motivations underlying the witness' testimony and, thus, enables the jury to more accurately assess the witness' credibility." *Drews*, 877 F.2d at 12. Moreover, the plea and cooperation agreements will be equal fodder for cross examination on behalf of

the defense, thereby obviating any concern the defense may have with respect to bolstering. *See id.* ("[T]he existence of a plea agreement may support the witness' credibility by showing his or her interest in testifying truthfully[;] the plea agreement may also impeach the witness' credibility by showing his or her interest in testifying as the government wishes regardless of the truth.")

Courts in this District have acknowledged the admissibility of cooperator plea agreements under similar circumstances. *See United States v. Solomon et al.*, Case No. 23-cr-156 (SRN/TNL) at ECF No. 275 (D. Minn. Aug. 9, 2024) (granting a pretrial ruling permitting the government to elicit testimony from cooperators as to the terms of their plea agreements and to introduce the written plea agreements into evidence). To the extent the Court is concerned about the potential for juror confusion, the United States endorses a limiting instruction clarifying that evidence of a guilty plea cannot be construed as determinative of any of the defendants' guilt at trial but that the jury may consider this evidence within the context of evaluating the witness' credibility. This request is consistent with this Court's practice and ruling in the previous trial for this matter.

The agreements should be admitted.

**10. *Government's Tenth Motion—References to National or Local Police Controversy***

The United States also moves to preclude the defendants or their counsel from pursuing lines of inquiry designed to elicit jury nullification and from suggesting to the jury that it decide this case on anything other than the evidence and the law as provided by the Court in its instructions. *See United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."); *Scarpa v. Dubois*, 38 F.3d 1, 11 (1st Cir. 1994) (noting that "defense counsel may not press arguments for jury nullification in criminal cases"); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) ("Neither court nor counsel should encourage jurors to exercise [nullification] power . . . . A trial judge, therefore, may block defense attorneys' attempts to serenade a jury with the siren song of nullification."). Specifically, the United States moves to preclude the defendants or their counsel from introducing at trial (through testimony or argument or questioning) references to national or local controversies regarding use of force by police officers. This evidence is not only irrelevant under Rule 401 but violates several precepts of Rule 403—this is especially so because this case involves numerous law enforcement witnesses from the Minneapolis Police Department who served in the wake of

the George Floyd murder.  Controversies unrelated to the facts of the case risks injecting sympathies and prejudices that would tend to confuse, distract, and mislead the jury.  These topics should be excluded.

**11.** ***Government's Eleventh Motion—Motion to Exclude Testimony of Odell Wilson***

The United States moves to exclude the testimony of Odell Wilson.

Defendant Trevaun Robinson has indicated that he intends to call Odell Wilson as an expert witness; Robinson has adopted Mr. Wilson's previous Rule 16 disclosure.  Mr. Wilson's testimony in the first trial ins this case (*United States v. D. Johnson, Hamilton, and Pruitt*) showed that Mr. Wilson is not sufficiently familiar with the structure and activities of North Minneapolis gangs in general, and of the Highs enterprise in particular.  He is therefore not qualified to render an expert opinion.

To offer opinion testimony, the proponent must demonstrate by a preponderance of the evidence that the witness is "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The proponent must also show that

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.*

In this case, Mr. Wilson prior testimony shows that he does not meet this standard.[6]

Mr. Wilson testified that there are no "gangs" in North Minneapolis— only "cliques" that are not affiliated. This is an extraordinary opinion. There have been innumerable cases in this District where courts have found defendants to have committed crimes in relation to North Minneapolis gangs. *See, e.g., United States v. Dunn*, 17-168 (SRN/KMM), ECF No. 57 at 3 (noting that the PSR, subsequently adopted by the district court, found the defendant possessed a firearm with a drum magazine, a laser sight, and the words "DIE Yk" etched into it that was a reference Dunn's targeting of the rival North Minneapolis "Young n' Thuggin" gang.). Mr. Wilson went further, testifying that there is no such thing as "Highs" or "Lows" associations among these "cliques"—these terms are limited to geographical boundaries alone. This too is an extraordinary opinion. In addition to this case, where more than two dozen defendants pleaded guilty and admitted under oath to membership in

---

[6] The government has ordered a transcript of Mr. Wilson's testimony but has not yet received a copy. The following summary is based on the government's notes and recollection of Mr. Wilson's testimony.

the Highs, there have been numerous prior cases charging Highs and Lows conspiracies. *See, e.g.*, *United States v. Wright, et al.*, 17-301 (WMW/DTS) (charging a Lows gang conspiracy pursuant to 18 U.S.C. § 924(o)); *United States v. Williams, et al.*, 17-060 (SNR/HB) (charging a Highs gang conspiracy pursuant to 18 U.S.C. § 371); *United States v. Black, et al.*, 14-364 (RHK/FLN) (charging a Lows gang conspiracy pursuant to 18 U.S.C. § 371).

These extraordinary claims were based on Mr. Wilson's prior service as a U.S. probation officer, and Mr. Wilson's having lived in North Minneapolis. This foundation is insufficient. Cross-examination revealed that Mr. Wilson was largely ignorant as to the structure and activities of the cliques about which he purported to be an expert. He was not aware of any hand-signs (even the "Y" hand-sign that was ubiquitous throughout trial, in which the index and pinky finger are extended from a fist) and could not independently name any Low-end cliques. On cross-examination, he appeared uncertain and tentative, and walked back many of his statements, admitting that "High-end" and "Low-end" cliques shot each other and could not enter each other's territory.

Much of his testimony appeared to have been informed by his own experiences having grown up in east-side projects in Massachusetts, where an "E" hand-sign was intended to express community pride and was utterly unrelated to any criminal activity (he testified that the "E" stood for

"excellence"). This experience bears little resemblance, and has no relevance, to the current events and reality of North Minneapolis.

Mr. Wilson's testimony also included speculation. He testified about defendants' and co-conspirators' intent, including that the display of cash in social media, and the creation and posting of rap videos discussing shootings and gang warfare, was not indicative of criminal activity but rather was only posturing. This speculation goes beyond any basis of knowledge that Mr. Wilson would have, and furthermore intrudes upon the province of the jury. *See United States v. Nickelous*, 916 F.3d 721, 724 (8th Cir. 2019) (upholding exclusion of proposed expert testimony because "it would not assist the trier of fact" and would intrude upon "the exclusive province of the jury.").

Mr. Wilson's testimony was also based on outdated knowledge. He testified in direct examination that gangs engaged in graffiti and wore colors, but on cross-examination acknowledged that these were features more of gangs in the 1980s and 90s and agreed that gang culture had changed since then.

Mr. Wilson also testified as to what gangs *are*, opining that a gang has structure and a hierarchy. There is no foundation for this opinion—it is based on what Mr. Wilson thinks a gang *ought* to look like. And not only does this opinion likewise invade the province of the jury, but it is inconsistent with the law governing RICO conspiracy. As the Court instructed the jury:

41

> An association-in-fact enterprise need not have a hierarchical structure or a "chain of command." Decisions may be made on an ad hoc basis and by any number of methods, including by consensus or show of strength. Members of the group need not have fixed roles. Different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, an enterprise's associates may engage in spurts of activity punctuated by periods of inactivity. An enterprise is not limited to groups whose crimes are sophisticated, diverse, complex, or unique.

(Jury Instruction No. 20, pp. 24 – 25, relying upon *Boyle v. United States,* 556 U.S. 938, 946 (2009).)

Mr. Wilson should be commended for his years of service as a probation officer. However simply put he is not qualified to render an expert opinion on the structure of Highs gangs, or the lack thereof. He has no direct knowledge, and no specialized knowledge. His testimony is not based upon sufficient facts or data. His opinions about gang structure are based on speculation, outdated knowledge, and his own irrelevant experiences growing up. His opinions invade the province of the jury and misstate the standard governing RICO conspiracy. His testimony should therefore be excluded.

**12.** ***Government's Twelfth Motion—Motion to Exclude Juvenile Convictions and Pending Charges***

The United States respectfully moves for a pretrial ruling excluding testimony or evidence regarding two juvenile convictions and pending charges

involving a cooperating government witness Clinton Brown.

Clinton Brown is a cooperating defendant. He will testify at trial regarding the Highs enterprise and the substantive crimes committed in furtherance of the charged RICO conspiracy and drug conspiracy. In 2008 and 2010, respectively, Mr. Brown sustained three felony convictions. In 2008, Mr. Brown was convicted of Fourth Degree Criminal Sexual Conduct and Fifth Degree Assault. The events giving rise to these charges occurred when Mr. Brown was 14 years old. In 2010, Mr. Brown was convicted of failing to report a change of address. He was 16 years old at the time.

Rule 609 expressly disfavors impeachment by juvenile adjudications, Fed. R. Evid. 609(d). *See United States v. Streb*, 36 F.4th 782, 789 (8th Cir. 2022) (noting the "limited admissibility" of these adjudications). Under the rule, evidence of a juvenile adjudication is admissible only if certain conditions apply. Specifically, a juvenile offense may only be admitted against a non-defendant in a criminal case if an "adult's conviction for that offense would be admissible to attack the adult's credibility" and "if admitting the evidence is necessary to fairly determine guilt or innocence." Fed. R. Evid. 609(d). It is simply not the case that Mr. Brown's juvenile convictions for criminal sexual conduct, assault, and failure to register are "necessary to fairly determine guilt or innocence" of the named defendants. None of the circumstances involved these juvenile adjudications have any connection to the conduct charged in this

43

case or the circumstances of the Highs enterprise generally. Moreover, because Mr. Brown's juvenile convictions are greater than ten years old, their admissibility rests on whether their probative value substantially outweighs their prejudicial effect. Here, the juvenile convictions have no probative value and, due to their nature, would simply serve to inflame the jury's passions. They should be excluded.

In addition, Mr. Brown has two pending criminal cases in Hennepin and Wright counties, respectively. The Hennepin County case involves a failure to register (arising out of Mr. Brown's chronic homelessness) and the Wright County case involves an alleged violation of a restraining order. By its own terms, Rule 609 applies to scenarios in which an party seeks "to attack[] a witness's character for truthfulness by evidence of a criminal *conviction*." The charges do not involve violent crime, narcotics, or crimes committed in connection with the Highs enterprise. These pending charges should be excluded.

*/s/ Brian W. Lynch*
BRIAN W. LYNCH
Trial Attorney
Ohio Bar No. 86245
Violent Crime and Racketeering Section
U.S. Department of Justice
Washington, DC 20530


*/s/ Alyssa Levey-Weinstein*
ALYSSA LEVEY-WEINSTEIN
Trial Attorney
NJ Bar No. 338742021
Violent Crime and Racketeering Section
U.S. Department of Justice
Washington, DC 20530


*/s/ Thomas Calhoun-Lopez*
THOMAS CALHOUN-LOPEZ
Assistant United States Attorney
DC Bar No. 480908DC
United States Attorneys' Office
District of Minnesota
Minneapolis, Minnesota 55415


*/s/ Carla J. Baumel*
CARLA J. BAUMEL
Assistant United States Attorney
Minnesota Bar No. 0504848
United States Attorneys' Office
District of Minnesota
Minneapolis, Minnesota 55415